## UNITED STATES v. SUBURBAN MOTOR SERVICE CORPORATION et al.

### No. 13687.

District Court, N. D. Illinois, E. D.

Feb. 10, 1934.

Dwight H. Green, U. S. Dist. Atty., and Leo J. Hassenauer, First Asst. U. S. Atty., both of Chicago, Ill., and David A. Moscovitz, Atty., Petroleum Administration Board, of Washington, D. C., for the United States.

Max M. Korshak, of Chicago Ill. (Harry J. Myerson, of Chicago, Ill., of counsel), for defendants.

BARNES, District Judge.

This cause came on to be heard upon the motion of the government for a temporary restraining order.

The government read, in support of its motion, the sworn bill of complaint and affidavits of various persons in support of certain of the allegations of the bill. The defendants read, in opposition to the motion, the sworn answer of the defendants and certain affidavits in support thereof.

The bill alleges, generally: That the jurisdiction of the court is invoked under the provisions of section 3 (c), title 1 of the National Industrial Recovery Act (15 USCA § 703 (c), approved June 16, 1933; that the defendants are engaged in the business of selling and offering for sale to the public, at retail, gasoline and other petroleum products in Chicago and Cicero, Cook county, Ill.; that by virtue of the authority vested in him by title 1 of the National Industrial Recovery Act, the President of the United States, by Executive Order No. 6256, dated August 19, 1933, approved a Code of Fair Competition for the Petroleum Industry, rules 2 and 17, article 5, of which read as follows:

"Rule 2. Whenever any merchant or vendor of any and all types of merchandise offers for sale at wholesale or retail, motor fuels, motor lubricants, motor gasoline, heating oils, or naphtha of a petroleum nature, he shall, in so far as his business pertains to those products, be bound by the regulations of this Code."

"Rule 17. Except by permission of the Planning and Coordination Committee, refiners, distributors, jobbers, wholesalers, retailers, and others engaged in the sale of petroleum products shall not give away oil, premiums, trading stamps, free goods, or other things of value, or grant any special inducements in connection with the sale of petroleum products."

The bill further alleges that the defendants, since the effective date of the Code, have, through advertising signs along the public highways and in front of their respective service station premises, announced to the public and prospective buyers of petrole-

um products that, upon certain days, they would give away free of charge certain premiums and things of value with each purchase of a stated number of gallons of gasoline; that on December 14, 1933, the defendants, at their place of business, in Chicago, sold and delivered to one White 7 gallons of gasoline and in connection with such sale gave White, free, as a premium with the purchase of said gasoline, 6 beverage glasses; that, on the same date, one of the defendants, at its place of business in Cicero, sold and delivered to one Gerhart, 7 gallons of gasoline and in connection therewith gave him, free, 6 beverage glasses; and that on January 5, 1934, the defendants, at their place of business in Chicago, sold to one Kruse, 7 gallons of gasoline, and in connection with such sale gave him, free, as a premium, a glass lemon squeezer; that said defendants are knowingly, willfully, and unlawfully disregarding the provisions of the Petroleum Code and the National Industrial Recovery Act in transactions affecting interstate commerce in petroleum products, and unless restrained and enjoined by this court will continue so to do. It is further alleged that the practice of giving away premiums and free goods, and of granting special inducements in connection with the sale of petroleum products, has seriously and adversely affected, during several years last past, the whole of the petroleum industry in the United States, and has caused drastic price wars, which have frequently extended across state lines; and that such practice has caused or contributed to the disorganization of interstate and foreign commerce, caused reduction of wages, growth of unemployment, and waste of an exhaustible natural resource throughout the United States. The prayer of the bill is that a temporary restraining order, and also a temporary and permanent injunction, issue, restraining the defendants, and all persons acting under their directions, from advertising the giving away of and from giving away oil, premiums, trading stamps, free goods, or other things of value, or granting any special inducements in connection with the sale of petroleum products.

By their answer, the defendants admit that they own and operate service stations for the retail sale of petroleum products, that they have advertised to prospective buyers, and that they did, upon certain days, give away free of charge certain stated premiums and things of value with sales of gasoline, but they charge that such conduct is not unlawful for the reason that the provisions of the Code, in so far as they attempt to prohibit such practices, are unreasonable, unfair, unconstitutional, and void. They deny that the violation of the Code, as charged in the bill, affects interstate commerce in petroleum products. They allege that their retail dispensing and service stations are not amenable to the provisions of the National Industrial Recovery Act or the Code of Fair Competition for the reason that they are conducting a purely local and intrastate business, that their patronage is derived entirely from individuals who call at the places of business of defendants, that they do not transport out of the state of Illinois any of the products sold or dealt in by them, that they have no transactions with individuals in other states, "and that all of their products are obtained from persons who have all of the merchandise used by them or either of them, and have their offices" in Chicago, Ill. They further allege that there is not, and has not been, any price-cutting war between various gasoline operators in the city of Chicago; that the small independent dealers, of which they are a part, have been placed at a disadvantage with respect to the major oil companies, in that the latter spend large sums of money in advertising their products, and as a result they obtain a very substantial part of the business of the public; that to overcome those advertising campaigns and to induce patronage, a number of small independent dealers, including defendants, give away to their customers small articles of various kinds by way of premiums; that they would be forced out of business unless they give premiums; that the Code, containing rule 17, was drafted and submitted to the President by a committee consisting of the representatives of the major companies, and that the independent companies had no representation in the preparation of said Code; that the representatives of the major petroleum companies incorporated in said Code needless regulations which will have the effect of putting the small independent and retail dealers out of business. It is further charged by the defendants that rule 17 of the Petroleum Code, in so far as it attempts to regulate a local and intrastate business, is in violation of clause 3, section 8, Article 1 of the Constitution of the United States, and is invalid, and, further, that rule 17 violates the Fifth and Tenth Amendments to the Constitution of the United States.

The arguments of counsel have presented for consideration and determination by the court the following questions: (1) Does emergency create federal power? (2) Do rules 2 and 17 of article V of the Code of

Fair Competition for the Petroleum Industry violate the Fifth Amendment to the Federal Constitution? (3) Did the Congress, in enacting the National Industrial Recovery Act, delegate its legislative power in violation of the Constitution of the United States? (4) Within which, if any, of the grants of power found in the Federal Constitution are included the powers exercised in enacting and enforcing the National Industrial Recovery Act and in promulgating and enforcing rules 2 and 17 of Article V of the Code of Fair Competition for the Petroleum Industry?

Does emergency create federal power?

▆▆▆▆ The Congress of the United States has, in section 1, title 1, of the National Industrial Recovery Act (15 USCA § 701), declared that a national emergency exists. This declaration is made in the following words: "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist." It is contended that this emergency creates federal power.

The Supreme Court of the United States, in the recent case of Home Building & Loan Ass'n v. Blaisdell, 54 S. Ct. 231, 235, 78 L. Ed. —— (opinion filed January 8, 1934), where the court considered the effect of the contract clause of the Federal Constitution and the due process clause of the Fourteenth Amendment to the Federal Constitution on an exercise of the police power of the state of Minnesota—on the power of that state to enact a law providing for the postponement of mortgage foreclosure sales and the extension of the periods of redemption from said sales, said: "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the States were determined in the light of emergency, and they are not altered by emergency."

The Supreme Court was, in the case to which the court has just referred, considering an exercise of a power by a state, which, of course, possesses all powers except those prohibited to it and those delegated to the United States. U. S. Const. Amend. 10; U. S. ex rel. Turner v. Williams, 194 U. S. 279, 296, 24 S. Ct. 719, 48 L. Ed. 979; Ham-

mer v. Dagenhart, 247 U. S. 251, 275, 38 S. Ct. 529, 62 L. Ed. 1101, 3 L. R. A. 649, Ann. Cas. 1918E, 724. In the case at bar, the court is considering an exercise of power by the federal government, which, as has been many times said, is a government of enumerated powers, a government which possesses only those powers which have been granted to it. Martin v. Hunter, 1 Wheat. 326, 4 L. Ed. 97; McCulloch v. Maryland, 4 Wheat. 405, 4 L. Ed. 579; Buffington v. Day, 11 Wall. 124, 20 L. Ed. 122. The principle found in the above-quoted extract from the opinion of the Supreme Court seems to apply with greater force to a government of limited and enumerated power, such as the United States government, than to a relatively absolute, unrestrained sovereign, such as a state. It must be held that emergency does not create federal power.

Do rules 2 and 17 of article V of the Code of Fair Competition for the Petroleum Industry violate the Fifth Amendment to the Federal Constitution?

▆▆▆▆ The Congress has found that an emergency exists. While it is true that this finding is not conclusive and that the courts may inquire as to the existence of the emergency (Chastleton Corp. v. Sinclair, 264 U. S. 543, 547, 548, 44 S. Ct. 405, 68 L. Ed. 841), yet the Supreme Court of the United States has, as recently as January 8, 1934, in the case of Home Building & Loan Ass'n v. Blaisdell, supra, acquiesced in a like finding of emergency by the Legislature of Minnesota. Accordingly, this court would not be justified in acting upon any other hypothesis than that the emergency found by the Congress does in fact exist. In the case lastly above mentioned, the Supreme Court considered the existence of an emergency in determining whether the time, place, and circumstances were such as to warrant the exercise of a power already existing, as against a charge that the exercise of the power was in violation of constitutional prohibitions against the impairment of contract and the deprivation of property without due process of law.

If it be assumed, first, that the power to enact laws like unto the provisions of rules 2 and 17 of article V of the Code of Fair Competition for the Petroleum Industry is included in some one or more of the powers delegated to the United States, and, second, that the Congress in enacting the National Industrial Recovery Act (48 Stat. 195), did not delegate its legislative power in violation of the Constitution of the Unit-

ed States, then the court is of the opinion that it must be held, on the authority of Highland v. Russell Car & Snowplow Co., 279 U. S. 253, 49 S. Ct. 314, 73 L. Ed. 688; Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; and Chastleton Corp. v. Sinclair, 264 U. S. 543, 44 S. Ct. 405, 68 L. Ed. 841, and on the analogy of Home Building & Loan Ass'n v. Blaisdell, 54 S. Ct. 231, 78 L. Ed. ——, and Brown Holding Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877, that rules 2 and 17 of article V of the Code of Fair Competition for the Petroleum Industry are not violative of the Fifth Amendment to the Federal Constitution.

■ Did Congress, in enacting the National Industrial Recovery Act, delegate its legislative power in violation of the Constitution of the United States?

The Supreme Court of the United States has said: "That Congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution." Field v. Clark, 143 U. S. 649, 692, 12 S. Ct. 495, 504, 36 L. Ed. 294. But that court has been liberal in the application of the rule. See Norwegian Nitrogen Products Co. v. U. S., 288 U. S. 294, 305, 53 S. Ct. 350, 77 L. Ed. 796. The question in each case seems to be whether the legislative branch of the government has, with sufficient definiteness, announced the legislative policy. If the Congress has, in the National Industrial Recovery Act, announced a legislative policy, it is in the following language, found in title 1, section 1 (15 USCA § 701): "It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing pur-

chasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

It seems to the court that Congress in this act has been so indefinite in its pronouncement of the legislative policy that the principle of constitutional law which we are considering has ceased to have any effect in national affairs, if the act is valid. If the Congress may constitutionally delegate power as it has delegated it in the National Industrial Recovery Act, it is difficult to see why the Congress may not, in an act, declare that its policy is to provide for the general welfare of all the people and that, accordingly, the President may promulgate such rules and regulations, having the effect of law, as will in his discretion best provide for the general welfare of all the people, and, when that happens constitutionally, constitutional government, as we have known it, will cease to exist.

But, while the principle that legislative power may not by Congress be delegated to other agencies of government has been frequently announced, yet decisions which have held acts of Congress invalid because of violation of the principle are difficult or impossible to find. Accordingly, this court, being one of the inferior courts contemplated by the Constitution, does not feel justified in declaring the act in question invalid because of the violation of the principle of constitutional law prohibiting the delegation of legislative power.

Within which, if any, of the grants of power found in the Federal Constitution are included the powers exercised in enacting and enforcing the National Industrial Recovery Act and in promulgating and enforcing rules 2 and 17 of article V of the Code of Fair Competition for the Petroleum Industry?

The defendants buy the petroleum products in which they deal in Cook county, Ill., and sell them from retail gasoline stations in the same county to the ultimate consumers thereof. Three specific violations of the Code are charged in the bill. Each is a sale of 7 gallons of gasoline with which, in two of the cases, 6 beverage glasses were given away, free, as a premium, and in the third, a lemon squeezer was given as a premium.

The government contends that the use of premiums in the retail marketing of gasoline results in a chaotic retail market, which, in turn, disturbs and disrupts the interstate commerce in petroleum products, and that

these facts warrant federal prohibition of the use of premiums. The power thus referred to is granted in the following language: "The Congress shall have Power * * * (3) To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes; * * * (18) To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers. * * *" U. S. Constitution, art. 1, § 8.

Are the acts sought to be prohibited directly within interstate commerce? On the facts, the answer is no. The government does not so contend.

Are the acts sought to be prohibited of such influence on interstate commerce that the Congress has implied power to regulate them? This question calls for a conclusion of fact and might well be presented to an economist, but it is here presented to the court and must be answered in the light of the decisions of the Supreme Court.

The Supreme Court has held that Congress may control intrastate activities when they tend to burden or interfere with interstate commerce, when their "effect upon commerce among the states is not accidental, secondary, remote, or merely probable," and, particularly, when they are within the stream of interstate commerce. Swift & Co. v. U. S., 196 U. S. 375, 25 S. Ct. 276, 279, 49 L. Ed. 518; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839. The doctrine of interference with the stream of interstate commerce does not justify the Code rules here sought to be enforced. The stream of interstate commerce ceases to flow before the acts sought to be prevented take place.

The cases of Houston, E. & W. T. R. Co. v. U. S., 234 U. S. 342, 34 S. Ct. 833, 837, 58 L. Ed. 1341, and Railroad Comm. of Wis. v. Chicago, B. & Q. R. Co., 257 U. S. 563, 42 S. Ct. 232, 237, 66 L. Ed. 371, 22 A. L. R. 1086, go as far as any of the cases. In these cases, as in the other cases above cited, it is desirable to distinguish between what the court decided and what the court said. In the Houston Case, the facts were as follows: One railroad led from Shreveport, La., to Dallas, Tex. The boundary line between Louisiana and Texas is much nearer Shreveport than it is either of the other cities. The gravamen of the complaint was that the carriers made rates out of Dallas and other Texas points into Eastern Texas which were much lower than those which they extended into Texas from Shreveport. A careful examination of the opinion discloses that the following language in the opinion by Mr. Chief Justice Hughes, then Mr. Justice Hughes, most nearly expresses the decision of the court (italics supplied): "Congress, in the exercise of its paramount power, may prevent the *common* instrumentalities of interstate and intrastate commercial intercourse from being used in their intrastate operations to the injury of interstate commerce." The railroads in question in that case were the "common instrumentalities of interstate and intrastate" commerce; that is to say, each of the two railroads in question was an interstate carrier, and also an intrastate carrier. It cannot be said that the retail gasoline stations in the case at bar are "common instrumentalities of interstate and intrastate" commerce. The interstate commerce in petroleum products, with which we have to deal in the case at bar, ceases before, or at the latest when, those products come into the possession of the defendants.

In the case of Railroad Comm. of Wis. v. Chicago, B. & Q. R. Co., supra, the Supreme Court of the United States held that the raising of the level of intrastate rates by the Interstate Commerce Commission was an incident to the effective control of the interstate system and did not violate the proviso against the Commission's regulating traffic wholly within a state. In this case the court said: "Effective control of the one must embrace some control over the other in view of the blending of both in actual operation. The same rails and the same cars carry both. The same men conduct them." Referring to the facts in the case at bar, it cannot be said that the same retail gasoline stations carry on both interstate and intrastate commerce, or that the same men conduct both interstate and intrastate commerce. Clearly, the doctrine of common instrumentalities does not justify the Code rules here sought to be enforced.

No one has yet had the temerity to suggest that the original package theory will justify the Code rules here in question.

There is language in some of the cases in the Supreme Court which, separated from the context, and particularly when considered separate and apart from the decisions, would seem to indicate that Congress may regulate every transaction which affects in any degree whatsoever interstate commerce. Such a holding is not, in the opinion of this court, warranted by any of the decisions of

the Supreme Court. In a certain sense, everything that any one does in these United States at any time during his or her life in some measure affects interstate commerce, but it will hardly be contended that these remote and indirect effects are sufficient to give warrant for the exercise of federal power.

■ The government contends that the practice of giving away premiums with petroleum products has seriously and adversely affected during the several years last past the whole of the petroleum industry in the United States and has caused drastic price wars which have frequently extended across state lines, and that such practice has caused or contributed to the disorganization of interstate and foreign commerce, caused reduction of wages, growth of unemployment, and waste of an exhaustible natural resource throughout the United States. On the other hand, the defendants contend that they are conducting a purely local and intrastate business; that their patronage is derived entirely from individuals who call at the places of business of defendants; that they do not transport out of the state of Illinois any of the products sold or dealt in by them; that they have no transactions with individuals in other states; that all of their products are obtained from persons who have their offices and merchandise in Chicago, Ill. They deny that there has been any price-cutting war between gasoline station operators in the city of Chicago. They allege that the small independent dealers, of which they are a part, are placed at a disadvantage with respect to the major oil companies because the latter spend large sums of money in advertising their products, and that, as a result, they obtain a very substantial part of the business of the public; that to overcome these advertising campaigns and to induce patronage, a number of small independent dealers, including defendants, give away to their customers small articles of various kinds by way of premiums; that they would be forced out of business unless they gave premiums.

These allegations raise a question of fact. Does the giving away of premiums with retail sales of gasoline adversely affect interstate commerce as a necessary consequence, or is the adverse effect on interstate commerce of the giving away of premiums with retail sales of gasoline merely accidental, secondary, remote, and problematical? The court very much doubts whether the giving away of premiums with retail sales of gasoline affects interstate commerce at all, but is definitely of the opinion that if the giving

away of such premiums does adversely affect such commerce, such adverse effect is not a necessary consequence, and, on the contrary, is merely accidental, secondary, remote, and problematical.

■ The people did not grant to Congress the power to regulate commerce generally. The power which was granted was, as we have observed, to regulate commerce "with foreign nations, among the several states, and with the Indian tribes." It is submitted that these words, "with foreign nations, among the several states, and with the Indian tribes," were intended to be and are a limitation upon the power granted. But if the construction insisted upon by the government in this case is given to the grant of power, then the limitation "with foreign nations, among the several states, and with the Indian tribes" must be disregarded.

It has been said that the decision of the Supreme Court in the case of Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, effectually prevents the sustaining of the National Industrial Recovery Act under the Commerce Clause of the Federal Constitution. That was a case in which an act of Congress, prohibiting the transportation in interstate commerce of goods produced in factories employing child labor, was held to be unconstitutional and invalid. In that case, the Supreme Court held that the evil sought to be prohibited was involved in the manufacturing and not in the transportation, and that it was complete before interstate commerce began. Viewed in this light, it is an authority against the validity of the National Industrial Recovery Act (48 Stat. 195). In the case at bar, interstate commerce certainly ceased, at the latest, with the sales of petroleum products at wholesale to the defendants, and upon no theory can it be held to have continued so as to include the retail sales at the gasoline stations. But the case at bar, in the opinion of the court, is a much stronger case than Hammer v. Dagenhart, supra. In that case, the product of child labor actually entered into interstate commerce, while in the case at bar, the practice of giving premiums, alleged to be unfair, does not inhere in or constitute a part of the interstate commerce in petroleum products.

The court cannot find any justification in the Commerce Clause of the Federal Constitution for the promulgation of rules 2 and 17 of article V of the Code of Fair Competition for the Petroleum Industry, or for the

adoption of the National Industrial Recovery Act, so far as it may authorize the promulgation of such rules; and no other provision of the Constitution has been called to the court's attention as being justification for that act.

The defendants contended upon the hearing that the provision of the Code prohibiting the giving away of premiums is in violation of that provision of the National Industrial Recovery Act which prohibits monopolistic practices, but because of the conclusion which the court has reached on other questions it has found it unnecessary to consider that particular question.

The motion for a temporary restraining order will be denied.