# FRANKLIN PROCESS CO. v. HOOSAC MILLS CORPORATION.

## No. 3926.

District Court, D. Massachusetts.

Oct. 19, 1934.

John W. Lowrance and Edward R. Hale, both of Boston, Mass., for receivers.

William M. Butler and James A. McDonough, both of Boston, Mass., receivers pro se.

Phillips Ketchum, of Boston, Mass., for New England Trust Co.

Fisher Abramson, of New Bedford, Mass., for First Nat. Bank of New Bedford, a creditor.

BREWSTER, District Judge.

The receivers of the Hoosac Mills Corporation have presented to this court a report on a claim of the United States for $81,694.28, representing a balance due on the processing and floor stock taxes assessed pursuant to sections 9 and 16 of the Act of May 12, 1933 (7 USCA §§ 609, 616), known as the Agricultural Adjustment Act. The receivers recommended that this claim be disallowed, and ask that the report be approved.

The report brings into question the validity of the tax. The matter was heard on evidence submitted by the government, oral arguments, and briefs. The evidence was largely received over the objections of the receivers, and so far as it or the arguments of both parties relate to the occasion for, the expediency of, or the results, beneficial or otherwise, of the Agricultural Adjustment Act, they must be disregarded, except as they tend to disclose the factual grounds upon which Congress proceeded in its declaration

of an emergency and of a legislative policy, and the Secretary of Agriculture proceeded in executing that policy. It can here be said, as was stated by Chief Justice Hughes in Home Building & Loan Association v. Blaisdell, 290 U. S. 398, at page 444, 54 S. Ct. 231, 242, 78 L. Ed. 413, 88 A. L. R. 1481, that "the declarations of the existence of this emergency by the Legislature * * * cannot be regarded as a subterfuge or as lacking in adequate basis. * * * The finding of the Legislature * * * has support in the facts of which we take judicial notice."

The facts controlling upon the issues presented may be briefly stated as follows:

On July 14, 1933, with the approval of the President, the Secretary of Agriculture promulgated a regulation which in part provided as follows:

"I do hereby ascertain and prescribe that for the purposes of said Act the first marketing year for cotton shall begin August 1, 1933.

"I do hereby determine as of August 1, 1933, that the processing tax on the first domestic processing of cotton shall be at the rate of 4.2 cents per pound of lint cotton, net weight, which rate equals the difference between the current average farm price for cotton and the fair exchange value of cotton, which price and value, both as defined in said Act, have been ascertained by me from available statistics of the Department of Agriculture."

The prescribed marketing year was consistent with the cotton year recognized by the Department of Agriculture, the Department of Commerce, private agencies in the United States and foreign countries, as well as by earlier congressional act. The rate of the tax was based upon reports and statistics gathered by the Department of Agriculture in accordance with the established practices from which were computed averages (1) of farm prices of cotton during the period August, 1909–July, 1914 (12.4 cents per pound), and (2) of the farm prices of cotton on June 15, 1933 (8.7 cents per pound), and also an index of prices paid by farmers for commodities which they bought (103 per cent.). Thus from the available statistics in the Department of Agriculture, the Secretary of Agriculture ascertained the "current average farm price" and "the fair exchange value" of the commodity involved. He determined the rate at which the processing and floor stock tax was to be levied, and thereupon proceeded to fix the rate of taxes at 4.2 cents per pound.

The Hoosac Mills Corporation is a processor of cotton, and had, or the receivers had, filed returns showing liability for the processing tax under section 9 of the Agricultural Adjustment Act for August, September, and October, 1933, and showing the floor stock tax for August, 1933. There is no dispute regarding the amount of the balance due on account of this tax liability.

The question whether the claim for these taxes can be recognized as a valid claim turns upon the constitutionality of title 1 of the Agricultural Adjustment Act (section 1 et seq. [7 USCA § 601 et seq.]). The act, in part, is entitled, "AN ACT To relieve the existing national economic emergency by increasing agricultural purchasing power, to raise revenue for extraordinary expenses incurred by reason of such emergency." The title contains a declaration of emergency and a declaration of legislative policy which are set forth in the following language:

"Title I—Agricultural Adjustment.

"Declaration of Emergency

"That the present acute economic emergency being in part the consequence of a severe and increasing disparity between the prices of agricultural and other commodities, which disparity has largely destroyed the purchasing power of farmers for industrial products, has broken down the orderly exchange of commodities, and has seriously impaired the agricultural assets supporting the national credit structure, it is hereby declared that these conditions in the basic industry of agriculture have affected transactions in agricultural commodities with a national public interest, have burdened and obstructed the normal currents of commerce in such commodities, and render imperative the immediate enactment of title I of this Act.

"Declaration of Policy

"Sec. 2. It is hereby declared to be the policy of Congress—

"(1) To establish and maintain such balance between the production and consumption of agricultural commodities, and such marketing conditions therefor, as will re-establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period. The base period in the case of all agricultural commodities except tobacco shall be the prewar period, August 1909–July 1914. In the case of tobacco, the base period shall be the postwar period, August 1919–July 1929.

"(2) To approach such equality of purchasing power by gradual correction of the

present inequalities therein at as rapid a rate as is deemed feasible in view of the current consumptive demand in domestic and foreign markets.

"(3) To protect the consumers' interest by readjusting farm production at such level as will not increase the percentage of the consumers' retail expenditures for agricultural commodities, or products derived therefrom, which is returned to the farmer, above the percentage which was returned to the farmer in the prewar period, August 1909–July 1914." 7 USCA §§ 601, 602.

For present purposes, the following summary of the provision of the act may be deemed adequate:

Part 2 of the title confers upon the Secretary of Agriculture, "in order to effectuate the declared policy," power to provide for crop reduction and benefit payments with respect to basic agricultural commodities through "agreements with producers or by other voluntary methods" (section 8 (1), 7 USCA § 608 (1).

To enter into marketing agreements with persons or associations "engaged in the handling, in the current of interstate or foreign commerce of any agricultural commodity or product thereof" (section 8 (2), 7 USCA § 608 (2); and to issue licenses to persons or associations so engaged (section 8 (3, 4), 7 USCA § 608 (3, 4), the licenses being subject to terms and conditions, compatible with statutes, which might be necessary to eliminate unfair practices or charges which tended to prevent the effectuation of the declared policy.

The act further provides that in order "to obtain revenue for extraordinary expenses incurred by reason of the national economic emergency, there shall be levied processing taxes" as provided in the act (section 9 (a), 7 USCA § 609 (a). When the Secretary of Agriculture determines that benefit payments are to be made, he shall proclaim such determination and a processing tax shall be in effect from the beginning of the next marketing year. The tax is levied on the first domestic processing of the commodity and is to be paid by the producer. The rate of the tax is fixed by the Secretary of Agriculture, but it must conform to the requirements of subsection (b) of section 9, and is to be determined as of the effective date of the tax. The rate must be adjusted from time to time to conform to the requirements of the statute at such intervals as the Secretary may deem necessary to effectuate the declared policy (section 9 (a), 7 USCA § 609 (a).

Subsection (b) of section 9 (7 USCA § 609 (b) is in the following terms:

"(b) The processing tax shall be at such rate as equals the difference between the current average farm price for the commodity and the fair exchange value of the commodity; except that if the Secretary has reason to believe that the tax at such rate will cause such reduction in the quantity of the commodity or products thereof domestically consumed as to result in the accumulation of surplus stocks of the commodity or products thereof or in the depression of the farm price of the commodity, then he shall cause an appropriate investigation to be made and afford due notice and opportunity for hearing to interested parties. If thereupon the Secretary finds that such result will occur, then the processing tax shall be at such rate as will prevent such accumulation of surplus stocks and depression of the farm price of the commodity. * * * "

Subsection c of section 9 (7 USCA § 609 (c) provides that for the purposes of the title the fair exchange value of a commodity shall be the price therefor that will give the commodity the same purchasing power, with respect to articles farmers buy, as such commodity had during the base period, namely, August, 1909–July, 1914. Cotton and any regional or market classification, type, or grade thereof is included in the term "basic agricultural commodity" (section 11 [7 USCA § 611]), and in case of cotton the term "processing" means the spinning, manufacturing, or other processing except ginning of cotton (section 9 (d) (2), 7 USCA § 609 (d) (2).

The act appropriated, in addition to the $100,000,000 out of other money in the treasury, "the proceeds derived from all taxes imposed under" title 1 of the act "to be available to the Secretary of Agriculture for expansion of markets and removal of surplus agricultural products, * * * administrative expenses, rental and benefit payments and refunds on taxes." Section 12 (b), 7 USCA § 612 (b). The tax may be abated or refunded if the Secretary of Agriculture shall certify that the effect of the tax is to substantially reduce consumption and increase the surplus of the commodity (section 15 (a), 7 USCA § 615 (a). The tax on products processed for exportation may also be refunded (section 17 (a), 7 USCA § 617 (a). If the Secretary determines that the tax is causing or will cause to the processor disadvantages in competition, he may, by proclamation, specify the competing commodity and the rate of the compensating tax necessary to

prevent such disadvantages in competition (section 15 (d), 7 USCA § 615 (d). A compensating tax is also levied on imported articles processed from commodities to which the act relates (section 15 (e), 7 USCA § 615 (e). The determination of the Secretary upon the effect of the act is made only after due notice and hearing.

The act provides for a floor stock tax on sales, or other disposition of articles already processed, which are held for sale at the time the processing tax takes effect. When the act ceases to be effective, there is a refund with respect to processed articles held for sale or distribution at the time of the termination of the act (section 16 [7 USCA § 616]).

Two underlying issues are presented. They are (1) whether the processing tax and the floor stock tax are valid impositions, and (2) whether the proceeds of the tax are appropriated for constitutional purposes. The issue, as I see it, is a broad one. It comprehends an inquiry into not only the scope of the taxing powers of Congress, but also into the powers of the federal government to regulate the production and the prices of basic agricultural commodities.

First. The receivers contend that the taxes are not lawful, because they are direct taxes and not apportioned, or if they be regarded as excises, they do not meet the requirements of uniformity.

██ The processing tax is clearly a tax upon the exercise of a particular use of property, namely, the privilege of manufacturing or otherwise processing a commodity. The tax conforms to that class of taxes upheld as proper excise taxes by the Supreme Court. Knowlton v. Moore, 178 U. S. 41, 48, 20 S. Ct. 747, 773, 44 L. Ed. 969; Bromley v. McCaughn, 280 U. S. 124, 50 S. Ct. 46, 47, 74 L. Ed. 226; Patton v. Brady, 184 U. S. 608, 22 S. Ct. 493, 46 L. Ed. 713; McCray v. United States, 195 U. S. 27, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; Nicol v. Ames, 173 U. S. 509, 19 S. Ct. 522, 43 L. Ed. 786. With respect to the floor tax, the nature of the tax is not so clearly defined because of the ambiguity in the language of section 16 (7 USCA § 616). Section 16 (a), 7 USCA § 616 (a) provides that upon the sale or other disposition of any article processed from any commodity, with respect to which a processing tax is to be levied, which is "held for sale or other disposition" when the processing tax first takes effect, or when it is wholly terminated, by any person, there shall be made a tax adjustment according to paragraphs (1) and (2) of subdivision (a), 7 USCA § 616 (a)

(1, 2). Paragraph (1) fixes the rate of the tax, and also provides that "whenever the processing tax first takes effect, there shall be levied, assessed, and collected" the tax. Subsection (a) provides for a tax adjustment when the sale is made, and (a) (1) provides that the tax shall be assessed when the processing tax takes effect. This apparent conflict can be reconciled by construing (a) (1) as merely fixing the time when the floor stock tax takes effect and the rate of the tax. This would be consistent with (a) (2) which fixes the time when the floor stock tax shall cease to operate. It obviously was the legislative intention that the two taxes should operate contemporaneously. (a) (1) sets out the method of adjustment as to goods on hand when the law became effective, and (a) (2) the method of adjustment as to goods on hand when the law ceases to be effective. In both instances, the adjustment is to be made "upon the sale or other disposition of any article." While this interpretation is not entirely free from doubt, it is to be favored, because the tax can then be treated as a tax imposed on the sale or other disposition of property, and therefore capable of being sustained as an excise. If it is held to be a tax levied or collected because of the general ownership of property, the tax would be a direct tax and fail, because it was not apportioned. Pollock v. Farmers' Loan &. Trust Co., 157 U. S. 429, 15 S. Ct. 673, 39 L. Ed. 759; Dawson v. Ky. Distilleries & Warehouse Co., 255 U. S. 288, 41 S. Ct. 272, 65 L. Ed. 638. If reasonably possible, that construction will be adopted which upholds the constitutionality of the act. Plymouth Coal Co. v. Commonwealth of Penn., 232 U. S. 531, 34 S. Ct. 359, 58 L. Ed. 713; Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525; Nicol v. Ames, supra.

If the tax be deemed to be one imposed upon the holding of the article for sale or other disposition, I can see no distinction in principle between the floor stock tax and the excise, considered in the case of Patton v. Brady, 184 U. S. 608, 22 S. Ct. 493, 46 L. Ed. 713, and it comes within the definition of an excise adopted in Bromley v. McCaughn, supra, where the court remarked:

"This court has consistently held, almost from the foundation of the government, that a tax imposed upon a particular use of property or the exercise of a single power over property incidental to ownership, is an excise which need not be apportioned."

██ The receivers argue that the tax does not comply with the requirements of section 8

of article 1 of the Constitution, that all excises shall be uniform throughout the United States. The argument is based upon the provisions of section 11 of the act (7 USCA § 611), which authorizes the Secretary of Agriculture to exclude from the operation of the act any basic commodity or any regional classification thereof. They say that if the power is exercised, a commodity from one part of the United States may be subject to the act, while the same commodity from another section would not be. "But what the Constitution commands is the imposition of a tax by the rule of geographical uniformity, not that in order to levy such a tax objects must be selected which exist uniformly in the several states." Mr. Justice White in Knowlton v. Moore, supra; Gottlieb v. White (D. C.) 1 F. Supp. 905, affirmed (C. C. A.) 69 F.(2d) 792. The tax meets this test of uniformity. Every processor of the commodity, wherever it may have originated, would be liable to the same tax upon that particular commodity or classification thereof. If the commodity happened to fall within the class of excluded commodities, the act would not operate upon the processing of it, and no tax could be imposed.

■ Second. The constitutionality of the act is assailed, upon the ground that it unlawfully delegates legislative power to the executive branch of the government. There are those who question whether the earlier accepted doctrine of the separation of powers of the government has today sufficient vitality to render it an adequate basis for setting aside an act of Congress on that ground. Modern writers refer to the doctrine as merely an "American primitive" or a constitutional dogma for which Montesquieu is held responsible, because he once said that the English people owed their liberty to the separation of governmental functions. Whether it is an "American primitive" or a dogma of foreign origin, it was recognized by Chief Justice Marshall in Wayman v. Southard, 10 Wheat. 1, 6 L. Ed. 253. In Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 504, 36 L. Ed. 294, the doctrine was deemed "vital to the integrity and maintenance of the system of government ordained by the constitution." See Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377; Union Bridge Co. v. United States, 204 U. S. 364, 381, 27 S. Ct. 367, 51 L. Ed. 523; J. W. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624; Mass. v. Mellon, 262 U. S. 447, 43 S. Ct. 597, 67 L. Ed. 1078; O'Donoghue v. United States, 289 U. S. 516, 53 S. Ct. 740, 77 L. Ed. 1356. There has, nevertheless, developed in the United States a marked tendency, which has attained considerable momentum during the last two years, toward the extension of fields of governmental activities, and hand in hand with this tendency has gone ever-increasing power to administrative officers to perform functions not strictly administrative but which partake of the character of legislative or judicial functions. Bureaus have been created with authority to interfere with the affairs of the individual. Regulations and executive orders with the force of law have been promulgated and have been upheld, even where a violation resulted in a penalty. United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563. The result of this tendency has been a vast accumulation of administrative law, so-called, applied by boards, commissions, and officials. (See Report of the Special Committee on Administrative Law to the Bar Association submitted at the 57th Annual Meeting.) The drift is not peculiar to the United States. The courts of England have given serious consideration to the growing mass of administrative law in that country. Some five years ago the Lord Chancellor referred to a committee the duty of considering "the powers exercised by or under the direction of (or by persons or bodies appointed especially by) Ministers of the Crown by way of (a) delegated legislation * * * and to report what safeguards are desirable or necessary to secure the constitutional principles of the sovereignty of Parliament and the rule of law." See Administrative Law in England, Iowa Law Review, vol. 18, p. 160.

It is significant, however, that up to the present time no act of Congress, so far as I am aware, has been held invalid, because it conferred legislative powers upon an executive or administrative officer, though several acts have been attacked on this ground. Thus the President's authority to suspend for such time as he should deem just the provisions of the Tariff Act of 1890 (26 Stat. 567) relating to the free introduction of certain commodities was upheld in Field v. Clark, supra. The Secretary of the Treasury was held to be lawfully authorized to establish standards to govern in the importation of teas, and to forbid importation which did not come up to the fixed standard. Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525. The court has also sustained an act authorizing the Interstate Commerce Commission to designate standard weights and maximum variation of drawbars for freight cars. St. Louis, Iron Mt. & S. R. R. Co. v. Taylor, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061, and likewise an act giving the President power to

change rates under flexible tariff provisions. J. W. Hampton, Jr., & Co. v. United States, supra. For other cases upholding the delegation of authority involving the exercise of powers of a legislative character, see Erhardt v. Boaro, 113 U. S. 527, 5 S. Ct. 560, 28 L. Ed. 1113; Avent v. United States, 266 U. S. 127, 45 S. Ct. 34, 69 L. Ed. 202; United States v. Grimaud, supra; United States v. Atchison, T. & S. F. R. R. Co., 234 U. S. 476, 34 S. Ct. 986, 58 L. Ed. 1408; Union Bridge Co. v. United States, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; Ryan v. Amazon Petroleum Corp. (C. C. A.) 71 F.(2d) 1; Williamsport Wire Rope Co. v. United States, 277 U. S. 551, 48 S. Ct. 587, 72 L. Ed. 985; Blair v. Oesterlein Mach. Co., 275 U. S. 220, 48 S. Ct. 87, 72 L. Ed. 249; Heiner v. Diamond Alkali Co., 288 U. S. 502, 53 S. Ct. 413, 77 L. Ed. 921; United States v. Shreveport Grain & Elevator Co., 287 U. S. 77, 53 S. Ct. 42, 77 L. Ed. 175; P. F. Petersen Baking Co. v. Bryan, 290 U. S. 570, 54 S. Ct. 277, 78 L. Ed. 505, 90 A. L. R. 1285.

These cases demonstrate that when Congress has gone as far as it reasonably can in declaring a policy, and the means to accomplish the end sought, leaving to administrative officers the filling in of details, the statute will very likely be upheld, even if no definite standard has been established, and though the functions are legislative in character.

In the light of the foregoing, it is necessary to consider the authority conferred upon the Secretary of Agriculture by title 1 of the Agricultural Adjustment Act. The Congress declared a policy which had for its objective the raising of the price level of agricultural commodities, and restoring the purchasing power of such commodities to that which obtained in the prewar period, 1909–1914. To that end, it authorized the Secretary to enter into agreements with producers to reduce production of certain specified basic agricultural products, to enter into marketing agreements with producers, to issue licenses permitting processors and associations of producers to engage in the handling in interstate commerce of agricultural commodities, upon such terms and conditions consistent with acts of Congress as the Secretary might deem necessary to eliminate unfair practices or charges that would tend to prevent the effective accomplishment of the declared policy or hinder the restoration of normal economic conditions. This program outlined by Congress necessarily involved the expenditures of large sums of money for benefit payments and for other purposes. To meet, in part at least, these expenditures, Congress saw fit to impose an excise on processing of certain basic agricultural products. It laid down a formula by which the rate of the tax was to be determined, and prescribed the source from which the Secretary should derive his data in applying the formula. The act leaves it with the Secretary to determine what basic commodities or classifications thereof should be brought under the act, and to fix the time when the tax provisions should become effective, and when they should cease to operate.

It also in section 9 (b) of the act (7 USCA § 609 (b), permits the Secretary to fix a rate which may not conform to the formula. There is a provision that if the Secretary has reason to believe that the rate will reduce the consumption, so as to result in a surplus of the commodity, or depress farm prices, he shall cause an investigation to be made, and if he finds that these results will occur, the rate then is to be such as will prevent such surplus or depression of prices. Obviously, the Secretary furnishes his own standard of what is required by these provisions. If Congress in its wisdom deemed it expedient to introduce into the legislation flexible provisions in order that a strict application may not defeat the intended end, it is doing no more than it has done in earlier tax legislation. Certain provisions of the Internal Revenue Act may be cited as illustrations: Sections 327, 328 of the Revenue Act of 1918 and 1921 (40 Stat. 1093, 42 Stat. 275); Williamsport Wire Rope Co. v. United States, supra; Heiner v. Diamond Alkali Co., supra; Blair v. Oesterlein, supra.

The question arises, therefore, whether it can fairly be said respecting the act that Congress, and not the Secretary, has imposed the tax, and having gone as far as it reasonably can in forwarding the avowed policy of the legislation, has conferred upon the Secretary merely discretionary authority to be exercised only in the execution of the law.

The formula for fixing the rate of taxes is somewhat indefinite. Statistics of the Department of Agriculture at best are only averages obtained from variable factors subject to different interpretations. The discretion to fix the rate, regardless of the formula, and to decide when and on what commodities a processing tax shall be levied, would seem to lodge with the Secretary power to impose taxes, a power which the Constitution placed with the legislative branch. It must, I think, be conceded that legislative functions are conferred upon administrative officers by the act. But whether there has been an unlawful delegation of power is to be doubted upon the authorities. The courts have not as yet clearly

defined the line between lawful and unlawful delegation of legislative power. While the Agricultural Adjustment Act would seem to come near the line, it would be presumptuous for this court to undertake to put the act outside the circle of the Constitution in view of earlier acts already cited which have received the sanction of the Supreme Court. So far as we are concerned with the delegation of legislative authority, I can see no sound distinction in principle between statutes imposing a duty on importation, and one imposing an excise on domestic manufactures.

Third. The receivers make the further contention that the tax is invalid because the act constitutes an unlawful attempt to legislate outside the powers granted to Congress and within the field of state powers.

The government argues that the receivers, as taxpayers, cannot attack the validity of the taxes by questioning the purposes for which they have been levied. If this issue involved only the legality of appropriations of proceeds of taxes lawfully exacted, the attack must necessarily fail. The course of history under the Constitution furnishes numerous instances where appropriations have been made for territorial expansion, to advance education, and to promote particular industries. Large appropriations have already been made to establish and maintain the Department of Agriculture and the varied activities of that Department. It is inconceivable that all these appropriations could have been illegal. Story in his work on the Constitution, § 991, says:

"Appropriations have never been limited by Congress to cases falling within the specific powers enumerated in the Constitution, whether these powers be construed in their broad or narrow sense."

But there is implicit in the issue something more than the power to appropriate public funds. While the statute (section 9 (a), 7 USCA § 609 (a) recites that the processing tax is to be levied "to obtain revenue for extraordinary expenses incurred by reason of the national economic emergency," the act, taken as a whole, leaves no doubt of the legislative intent to levy the tax for the purposes of defraying the expenses of administering the act and paying the debts incurred for benefit payments, and rentals incident to the crop reduction program.

The taxing power of Congress, while extremely broad, is not without its limitations, and one of these is that it shall be exercised for public uses as distinguished from private ends. Citizens' Sav. & Loan Association v. Topeka, 20 Wall. 655, 663, 22 L. Ed. 455.

In that case the court observed that, "of all the powers conferred upon government that of taxation is most liable to abuse. Given a purpose or object for which taxation may be lawfully used and the extent of its exercise is in its very nature unlimited."

But the court adds that "this power can as readily be employed against one class of individuals and in favor of another, so as to ruin the one class and give unlimited wealth and prosperity to the other, if there is no implied limitation of the uses for which the power may be exercised."

And in this opinion taxes are defined as "burdens or charges imposed by the legislature upon persons or property to raise money for public purposes."

The Constitution has restricted the power to levy taxes to two purposes, namely, payment of debts of the United States, and to provide for the general welfare of the United States. This "general welfare" clause does not embody a specific grant of power. Jacobson v. Mass., 197 U. S. 11, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765; Sherlock v. Alling, 93 U. S. 99, 23 L. Ed. 819. If, therefore, it should appear on the face of the act that it was calculated to benefit only private interests, it would be the duty of the court, I take it, to declare the tax unlawful. It is not, however, within the province of the court to substitute its judgment for that of Congress upon the effect of a particular measure manifestly designed to promote the general welfare of the people of the United States. It is no objection that individuals will derive profit from the consummation of the legislative policy. Individuals benefit from every bounty, subsidy, or pension provided for by statute, whether federal or state. Compare United States v. Realty Co., 163 U. S. 427, 16 S. Ct. 1120, 41 L. Ed. 215; Legal Tender Case, 12 Wall. (79 U. S.) 457, 20 L. Ed. 287; Mountain Timber Co. v. Washington, 243 U. S. 219, 238, 37 S. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D, 642; Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487. Another rule affecting the power of Congress to levy taxes is to be found in cases such as the Child Labor Tax Case, 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432, and Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822. This rule is that the law levying the tax must be a genuine revenue measure, and not one intended to operate merely as a penalty in order to "coerce people of a state to act as Congress wishes them to act in respect of a matter completely the business of the state government under the

federal Constitution." Chief Justice Taft in Child Labor Tax Case, page 39 of 259 U. S., 42 S. Ct. 449, 451. The Agricultural Adjustment Act does not offend in this respect. The principal purpose of the act is to regiment the agricultural industry by regulating production of certain agricultural commodities. The tax is incidental to this main object. The power to tax is not being used to coerce compliance with regulations prescribed by the Secretary of Agriculture.

The tax, on the contrary, is laid to produce revenue which Congress has, by appropriation, put at the disposal of the administrative officer to be used for the purposes of the act.

The third limitation is stated in the opinion of Veazie Bank v. Fenno, 8 Wall. 533, at page 541, 19 L. Ed. 482, where it is said: "There are, indeed, certain virtual limitations (upon the taxing power), arising from the principles of the Constitution itself. It would undoubtedly be an abuse of the power if so exercised as to impair the separate existence and independent self-government of the States, or if exercised for ends inconsistent with the limited grants of power in the Constitution."

It is necessary, therefore, to consider the purposes of the legislation in order to determine whether they are consistent with the granted powers.

The language employed in framing the act clearly indicates a legislative intent to bring the powers exerted within the commerce clause of the Constitution. Section 8 (2) and (3) of the act (7 USCA § 608 (2, 3), which deal with marketing agreements and licenses, by express terms limit the authority of the Secretary to deal only with those engaged in handling, in the course of interstate commerce, agricultural commodities. The provisions of section 8 (1), 7 USCA § 608 (1) relating to the reduction of acreage or production, and the payment of rental or benefits, are not so limited. But when read in connection with the declaration of an emergency, it becomes apparent that the Legislature sought to connect the power with interstate commerce by proceeding on the theory that "the acute economic emergency," which was partly the result of disparity between agricultural and other prices, destroying the purchasing power of farmers, gave rise to conditions in the basic industry of agriculture which affected transactions in agricultural commodities with the national public interest, and which burdened and obstructed the normal currents of commerce in such commodi-

ties. Whereupon Congress declared it to be its policy to restore farm prices to prewar levels, and to that end granted broad powers to the Secretary of Agriculture to enter upon a program which it was hoped would effectuate the policy and end the disparity. Here we note an ingenious attempt to bring this legislation within the scope of the powers conferred by the commerce clause.

We are, then, brought to an inquiry into the limitations which the courts have set about the commerce powers of the Congress. The grant is broad in its terms. The provisions of the grant have been accorded liberal interpretation, and within its proper scope it is said to be unlimited. The legislative motive in its exercise has been held to be "free from judicial suspicion and inquiry." Chief Justice Taft in Child Labor Tax Case, supra, page 39 of 259 U. S., 42 S. Ct. 449, 451.

It is necessary, however, to keep in mind the observation of Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 423, 4 L. Ed. 579, that Congress may not "under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government."

The development of the regulatory powers of Congress under the commerce clause presents an interesting study. The power was first applied to the instrumentalities of commerce. Examples: Interstate Commerce Act (49 USCA § 1 et seq.); Employers' Liability Act (45 USCA § 51 et seq.). The power has been exerted to prevent monopolies and restraints of trade. Examples: Anti-Trust Laws, see Standard Oil of New Jersey v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. It was also extended to prohibit transportation in interstate commerce of certain subjects of traffic the transportation of which was deemed to be detrimental to the public welfare. Lottery Case, Champion v. Ames, 188 U. S. 321, 23 S. Ct. 321, 47 L. Ed. 492.

But in Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, it was held that the power could not be exercised to exclude from commerce articles inherently innocent.

This outline is sufficient to illustrate the marked tendency of Congress, approved by the court, to centralize power in the federal government by invoking the grant contained in the commerce clause.

There are, however, to be inferred from the cases limitations imposed upon the exercise of the commerce power. It cannot be ap-

plied to the regulation of the manufacture of goods even though intended for shipment in interstate commerce. United States v. E. C. McKnight, 156 U. S. 1, 15 S. Ct. 249, 39 L. Ed. 325, see, also, Hammer v. Dagenhart, supra; Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct. 548, 76 L. Ed. 1038; Crescent Cotton Oil Co. v. Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166; Chassaniol v. Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004; nor to the mining of products. Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397; Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237; Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929. By the same token, the commerce powers, I take it, could not be extended to reach a crop of wheat or cotton, notwithstanding the farmer may have intended to introduce it into the channels of commerce. If, therefore, Congress had undertaken by coercive measures to regulate the amount of wheat or cotton a farmer should produce, a serious constitutional question would arise whether Congress had not extended the frontier of federal bureaucratic activities too far. But, as has already been noted, the authority delegated to the Secretary of Agriculture by the first subdivision of section 8 cannot be brought to bear upon any one who does not voluntarily submit to it and this for a monetary consideration. The authority in the second subdivision also presupposes agreement between the Secretary on the one hand and processors and producers on the other. It is only in the third subdivision that the regulatory powers may be forced upon the individual against his will, and these powers are restricted in their application to those engaged "in the handling, in the current of interstate or foreign commerce," of agricultural commodities.

As the matter comes before the court in the case at bar, my consideration is restricted to the law as it is written, and does not extend to the law as it may be interpreted and applied by administrative officers acting under color of its provisions. It is conceivable that the power to license may be exercised through the imposition of conditions in such a way that the regulation would be beyond the scope of the legitimate powers of Congress under the commerce clause. Such a result, however, is not to be presumed. Mountain Timber Co. v. Washington, supra; Prentis v. Atlantic Coast Line Co., 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150; Henderson Water Co. v. Corporation Commission, 269 U. S. 278, 46 S. Ct. 112, 70 L. Ed. 273; People ex rel. Lieberman

v. Van De Carr, 199 U. S. 552, 26 S. Ct. 144, 50 L. Ed. 305; Doherty v. McAuliffe (D. C.) 7 F.Supp. 49.

These cases also dispose of the contention of the receivers, that the legislation is class legislation, imposing burdens upon one class for the benefit of another.

Furthermore, the act was obviously enacted as an emergency measure, and, as such, it must be treated. Congress has declared that the conditions, which it aims to relieve by the measure, burden and obstruct the normal current of commerce in commodities. While in Hill v. Wallace, supra, the court refused to uphold the law involved, there was dicta in the opinion indicating that if Congress had from the evidence before it regarded that the sales for future delivery on a board of trade directly interfered with interstate commerce so as to be a burden or obstruction, the law would have been upheld on the doctrine of cases like United States v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518.

We have been recently told on the highest authority that an emergency does not create power, nor increase granted powers or diminish restrictions imposed upon powers granted or reserved; but that an emergency may furnish the occasion for the exercise of powers theretofore dormant. Home Loan Association v. Blaisdell, supra. A nation-wide economic disturbance may create a condition which would bring the purposes of the legislation into relationship with commerce which would not exist under normal conditions, thereby furnishing an occasion for the exercise of the commerce powers which might not be legally exercised under more favorable economic conditions.

It may be objected that if the law is to stand as a constitutional enactment, all limitations upon the power of the central government to regulate local and individual interests in a time of emergency would be effaced; that all Congress would have to do would be to declare a policy that the reduced purchasing power of any class of people burdened and obstructed the free flow of commerce. In fact, Congress has already enacted a National Industrial Recovery Act (48 Stat. 195) upon the declared policy that wide-spread unemployment has burdened or obstructed interstate commerce. This act, at least as construed and administered, has been held unconstitutional in Hart Coal Corp. v. Sparks (D. C.)

562

7 F.Supp. 16; United States v. Lieto (D. C.) 6 F.Supp. 32; United States v. Mills (D. C.) 7 F.Supp. 547.

The conclusions which I have reached are not necessarily in conflict with these cases, because I am dealing with an entirely different statute; and, as I have already indicated, I am concerned only with the statute and not with any regulatory act of an administrative officer.

■ Fourth. It is said that the statute cannot stand, because it denies to the taxpayer due process of law. In Nebbia v. People of State of New York, 291 U. S. 502, 525, 54 S. Ct. 505, 510, 78 L. Ed. 940, 89 A. L. R. 1469, it is stated: "The Fifth Amendment, in the field of federal activity," does "not prohibit governmental regulation for the public welfare." It merely conditions "the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts."

I am unable to discern any ground upon which it can fairly be argued that the law imposing the processing, compensating, and floor stock taxes is arbitrary, unreasonable, or capricious. Congress in its wisdom has seen fit to declare that the means selected have a substantial relation to the object sought to be attained. This declaration is not so wanting in substance as to warrant this court in treating it as a mere pretext.

■ Respecting the contention of the receivers, that the law is repugnant to the constitutional guarantees of a Republican form of government, it is only necessary to quote from the opinion in Mountain Timber Co. v. Washington, at page 234 of 243 U. S., 37 S. Ct. 260, 263, 61 L. Ed. 685, Ann. Cas. 1917D, 642, where it is observed: "As has been decided repeatedly, the question whether this guaranty has been violated is not a judicial but a political question, committed to Congress, and not to the courts."

■ The Agricultural Adjustment Act indubitably authorizes an executive to exercise powers of a legislative character. One may entertain doubts respecting the right of Congress to exert the powers which it has attempted in the act. But probably no presumption is more thoroughly established than the presumption that an enactment by a legislative body does not transcend the powers possessed by that body. Erie R. Co. v. Williams, 233 U. S. 685, 699, 34 S. Ct. 761, 58 L. Ed. 1155, 51 L. R. A. (N. S.) 1097; Mountain Timber Co. v. Washington, supra; United States v. L. Cohen Grocery Co., 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045. This presumption is especially strong when the issue is raised in the District Court in a case involving a statute of great public importance and by virtue of which vast sums have already been expended and equally vast sums have already been levied upon the processors of agricultural products. See United States v. Suburban Motor Service Corp. (D. C.) 5 F.Supp. 798; McCulloch v. Maryland, 4 Wheat. 315, 401, 4 L. Ed. 579.

In conclusion, I rule that the claim presented by the United States is a valid claim and should be allowed as such in these receivership proceedings.