## UNITED STATES v. KINNEBREW MOTOR CO. et al.

### No. 10909.

District Court, W. D. Oklahoma.
Nov. 12, 1934.

William C. Lewis, U. S. Dist. Atty., of Oklahoma City, Okl., and A. W. De Birny, Associate Counsel, NRA, of Washington, D. C., for the United States.

J. B. Dudley, of Oklahoma City, Okl. (Herbert K. Hyde, Duke Duvall, and Paul Dudley, all of Oklahoma City, Okl., on the brief), for defendants.

VAUGHT, District Judge.

The defendants in this action are charged by indictment with violation of the Act of Congress of June 16, 1933, known as the National Industrial Recovery Act (48 Stat. 195).

It is charged that the Kinnebrew Motor Company, an Oklahoma corporation, and Jackson A. Kinnebrew, defendants, are local dealers in Oklahoma City in Nash automobiles, and as said dealers purchase new Nash cars from the Nash Motor Company at Kenosha, Wis., and have the automobiles shipped to their place of business in Oklahoma City, Okl., where said automobiles are sold at retail, and where said defendants allow to purchasers of new cars a trade-in value for used cars.

The indictment further alleges that the said defendants are engaged in a retail business which constitutes interstate commerce in that the prices fixed for new cars, and the prices paid for used cars, affect and burden interstate commerce throughout the country.

The indictment further alleges that, by virtue of the power vested in the President of the United States by said act, and delegated by the President to the National Administrator of the Automobile Code, a certain code was adopted by the President on the recommendation of the National Administrator, which code fixes the prices at which new cars may be sold, and the prices which may be allowed for secondhand automobiles as credit on the purchase price of new automobiles.

The first count charges that the defendants did unlawfully sell one 1934 Nash automobile as a demonstrator for the sum of $800

which was less than the full retail price of $1,004.95, in a transaction in and affecting interstate commerce; that said automobile, manufactured in the state of Wisconsin for the purpose of sale in the state of Oklahoma, had not been in use for a period of sixty days from the date of registration with the Advisory Committee for the state of Oklahoma, and had not been registered at any time as provided by article 4, section B, paragraph 1 of the aforesaid Code, or by any regulation of the Administrator so made, adopted, and approved under the authority of the National Industrial Recovery Act; that said defendants did then and there knowingly, wilfully, and unlawfully commit a certain offense against the United States, to wit, violate article 4, section B, paragraph 1, in a transaction in and affecting interstate commerce, and by reason thereof did become subject to the provision of section 3(f) of the aforesaid National Industrial Recovery Act (15 USCA § 703(f), and so forth.

The second count charges that the defendants did unlawfully accept in trade a used Nash Victoria coupé at an allowance price of $181.22, in a transaction in and affecting interstate commerce, when the allowance price fixed by the code for such car was $25 as ascertained by the Administrator for Industrial Recovery, and so forth.

Count 3 charges that the defendants did unlawfully represent that the sale price of a 1934 Nash Town sedan was $1,005; whereas, in truth and in fact the sale price of said car was $899 delivered in Oklahoma City.

In count 4 the indictment charges that the defendants did unlawfully accept in trade a certain used Nash Special sedan at an allowance price of $200 in a transaction in and affecting interstate commerce, which used automobile had a value of $25 under the code as ascertained by the Administrator for Industrial Recovery.

The defendants have filed their joint and separate demurrers to each and all of the counts of said indictment, the said demurrers alleging that sections 701, 702(a, b), 703 (a, b, c, d, f), 704 (a, b), 705, 706(a, b, c), and 707(a, b, c, d) of title 15, USCA, sections 1, 2(a, b), 3(a, b, c, d, f), 4(a, b), 5, 6(a–e), 7 (a–d) of the Act of Congress of June 16, 1933, known as the National Industrial Recovery Act, being the act referred to in said indictment, and the Code of Fair Competition for the Motor Vehicle Retailing Trade adopted October 3, 1933, pursuant thereto, and particularly section B, paragraph 1, and section A, paragraphs 2 and 5 of article 4 thereof, being the code and provisions thereof referred to in said indictment, are void and violative of (a) section 1, article 1 of the Constitution of the United States, (b) the Fifth Amendment to the Constitution of the United States, and (c) the Tenth Amendment to the Constitution of the United States.

The demurrers also allege that the business transactions referred to and set out in said indictment are private ones in which these defendants had a right to engage under the Fifth Amendment to the Constitution of the United States; that the Congress of the United States is without power to regulate, restrict, or restrain these defendants in such business transactions under the Tenth Amendment to the Constitution of the United States; and said demurrers further allege that the business transactions referred to and set out in said indictment are not interstate transactions; that the Congress of the United States has no power to legislate concerning the same under section 8, article 1 of the Constitution of the United States, the commerce clause thereof; that Congress exceeded its authority in passing said act; and that such act and the code adopted thereunder are void and in violation of said commerce clause.

The demurrers further alleged that said indictment does not state facts sufficient to constitute an offense under any valid law of the United States.

The statute under which the offense in this indictment is charged is the Act of Congress approved June 16, 1933, known as the National Industrial Recovery Act, and the pertinent provisions of the act are the following:

"Sec. 1. *Declaration of policy.* A national emergency productive of wide-spread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural prod-

acts by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources." (15 USCA § 701.)

"Sec. 2. *Administrative agencies.* (a) To effectuate the policy of this chapter, the President is hereby authorized to establish such agencies, to accept and utilize such voluntary and uncompensated services, to appoint, without regard to the provisions of the civil service laws, such officers and employees, and to utilize such Federal officers and employees, and, with the consent of the State, such State and local officers and employees, as he may find necessary, to prescribe their authorities, duties, responsibilities, and tenure, and, without regard to the Classification Act of 1923, as amended [chapter 13 of Title 5], to fix the compensation of any officers and employees so appointed.

"(b) The President may delegate any of his functions and powers under this chapter to such officers, agents, and employees as he may designate or appoint, and may establish an industrial planning and research agency to aid in carrying out his functions under this chapter.

"(c) This chapter shall cease to be in effect and any agencies established hereunder shall cease to exist at the expiration of two years after the date of enactment of this Act [June 16, 1933], or sooner if the President shall by proclamation or the Congress shall by joint resolution declare that the emergency recognized by section 1 [section 701] has ended." (15 USCA § 702.)

"Sec. 3. *Codes of fair competition.* (a) Upon the application to the President by one or more trade or industrial associations or groups, the President may approve a code or codes of fair competition for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the President finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, and (2) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them, and will tend to effectuate the policy of this title: Provided, That such code or codes shall not permit monopolies or monopolistic practices: Provided further, That where such code or codes affect the services and welfare of persons engaged in other steps of the economic process, nothing in this section shall deprive such persons of the right to be heard

prior to approval by the President of such code or codes. The President may, as a condition of his approval of any such code, impose such conditions (including requirements for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees, and others, and in furtherance of the public interest, and may provide such exceptions to and exemptions from the provisions of such code, as the President in his discretion deems necessary to effectuate the policy herein declared."

"(c) The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under this chapter; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

"(f) When a code of fair competition has been approved or prescribed by the President under this chapter, any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall be a misdemeanor and upon conviction thereof an offender shall be fined not more than $500 for each offense, and each day such violation continues shall be deemed a separate offense." (15 USCA § 703 (a, c, f.)

"Sec. 10. *Rules and regulations.* * * * (a) The President is authorized to prescribe such rules and regulations as may be necessary to carry out the purposes of this chapter, and fees for licenses and for filing codes of fair competition and agreements, and any violation of any such rule or regulation shall be punishable by fine of not to exceed $500, or imprisonment for not to exceed six months, or both.

"(b) The President may from time to time cancel or modify any order, approval, license, rule, or regulation issued under this chapter; and each agreement, code of fair competition, or license approved, prescribed, or issued under this chapter shall contain an express provision to that effect." (15 USCA § 710.)

The particular portions of the code questioned by the indictment are:

"(1) No dealer shall sell a new car at retail to a consumer for less than factory list prices, plus an amount equal to

"(a) Equipment at listed prices.

"(b) All taxes paid by dealer applicable to the motor vehicle sold.

"(c) Average cost of transportation from factory of said dealer or shipments received by said dealer during a 60-day period as shown by sworn statement of said dealer.

"(d) Dealers actual cost of handling.
*　*　*"

The exceptions to the foregoing are motor vehicles sold to employees for use in their employer's business as demonstrators or executives' cars, and cars used as demonstrators by dealers, which must be so registered with their trade association, or with the State Advisory Committee, which demonstrators and executive cars shall not be sold to a consumer at retail for less than the full retail price, except when they have been in use for a period of at least sixty days, from the date of registration, as aforesaid, and have had at least 3,500 miles actual road usage, or when the manufacturer has made public announcement of a change in model.

The provision of the Code relative to used car allowance is:

"(1) That the value of any model of used motor vehicle, either passenger or commercial, shall be the average price that the public in any given market area is then paying for such vehicle as ascertained by the Association from sworn statements of all actual retail sales to consumers, subject to the approval of the Administrator. The Association shall publish the average prices thus ascertained approximately every 60 days. In order to insure fair average value in the interest of the consumer, published averages shall be computed for the preceding period and there shall not be included in computing such average that 20 percent of sales which represented the lowest sales of all actual sales reported in the previous period.

"(2) That no dealer shall, directly or indirectly, or by subterfuge, accept in trade any used vehicle at an allowance price of more than its value as ascertained in paragraph (1) above, less a minimum selling, handling, and reconditioning charge, according to the following schedule:

"(a) Five percent of the allowance price as determined in paragraph (1) above, on (x) the current series model, or (y) the preceding series model.

"(b) Ten percent of the allowance price as determined in paragraph (1) above on the model preceding, the two models described in paragraph (2) sub-section (a) above, namely (x) and (y).

"(c) Fifteen percent of the allowance price as determined in paragraph (1) above,

on all models other than the three models described in sub-sections (a) and (b) above."

The code, with reference to advertising, provides as follows: "No retailer shall use advertising, whether printed, radio, display or of any other nature, which is inaccurate in any material particular or misrepresents merchandise (including its use, trade-mark, grade, quality, quantity, size, origin, material, content, or preparation or credit terms, values, policies, or services; and no retailer shall use advertising and/or selling methods which tend to deceive or mislead the customer."

The existence of the emergency referred to in said act does not create constitutional power not then existing, and the declaration of the emergency by Congress does not add to or take from the then existing constitutional power of Congress.

Section 701 (15 USCA) section 1 of said act provides: "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist."

It is not necessary to spend any time in a discussion of this question. This matter has been before our highest court on many occasions, and under conditions as serious or even more serious than the present national emergency. It is well recognized in the history of our government that emergencies create no power not specifically conferred upon the national government by the Constitution.

In a recent case, Home Building & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 235, 78 L. Ed. 413, 88 A. L. R. 1481, the Supreme Court said, speaking through its Chief Justice: "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the states were determined in the light of emergency, and they are not altered by emergency. What power was thus granted and what limitations were thus imposed are questions which have always been, and always will be, the subject of close examination under our constitutional system."

And in Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 302, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, the same court said: "Nor is it an answer to this view to

suggest that the situation was one of emergency, and that emergency cannot be made the source of power. Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281. The proposition begs the question, since although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed."

The cases above cited merely state the rule that has been recognized by the Supreme Court since 1866, when the same court in an opinion in Ex parte Milligan, 4 Wall. 2, 120, 18 L. Ed. 281, said: "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence."

It would be folly, therefore, in the face of the foregoing decisions to argue or contend that an emergency affords power to the national government not already possessed by that government under ordinary conditions.

As to whether or not the act confers legislative power upon the President in violation of section 1, article 1 of the Constitution, as contended by the defendants, presents a serious question.

This court has grave doubts as to the constitutionality of the act, but, since the same question is now pending before the Supreme Court of the United States and in all probability will be determined by our highest court before it becomes necessary for any trial court to pass upon the question, it is deemed entirely proper to pass this question without opinion, and for the further reason that it is not necessary to pass upon that question in order to determine whether or not the indictment in this case actually charges an offense under the laws of the United States.

■ Reference has been made in the government's brief to the "Welfare Clause" of the Constitution as if certain powers could be derived by Congress from said clause. It is not necessary to indulge in an extended argument on this question for the reason that there is no such thing as the "Welfare Clause" of the Constitution. It is true that the Preamble sets out, as one of the reasons for the adoption of the Constitution, that the Constitution is adopted, among other reasons, to "Promote the general Welfare," but an interpretation of the Preamble has been given by our highest court, and in Jacobson v. Mass., 197 U. S. 11, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765, that court held: "The spirit of the Federal Constitution or its preamble cannot be invoked, apart from the words of that instrument, to invalidate a state statute." And in the body of the opinion the court said: "Although that Preamble indicates the general purposes for which the people ordained and established the Constitution, it has never been regarded as the source of any substantive power conferred on the government of the United States or on any of its departments. Such powers embrace only those expressly granted in the body of the Constitution, and such as may be implied from those so granted. Although, therefore, one of the declared objects of the Constitution was to secure the blessings of liberty to all under the sovereign jurisdiction and authority of the United States, no power can be exerted to that end by the United States, unless, apart from the Preamble, it be found in some express delegation of power, or in some power to be properly implied therefrom."

This opinion has never been reversed or modified and is the accepted construction placed upon the Preamble to the Constitution by our highest court.

It is contended by the defendants that the provisions of the Code of Fair Competition for the Motor Vehicle Retailing Trade, referred to in the indictment, are void and violative of sections 1 and 8 of article 1 of the Constitution, and of the Fifth Amendment thereto.

■ The indictment charges, in substance, that these defendants allowed a greater price for used automobiles than the price fixed by the code, and that they sold a new automobile at a lower price than that fixed by the code. It is true that throughout the indictment it is charged that all of these acts were done in interstate commerce, but these charges are merely the conclusions of the pleader. If an offense is stated in the indictment, that offense must be determined by the actual facts alleged in the indictment, which are:

(1) That these defendants are engaged in the retail automobile business in Oklahoma City;

(2) That the defendants have violated the code, in that they sold new cars at a lower

price than that fixed by the code, and allowed a trade-in value for used cars in excess of the price fixed by the code.

It is further alleged in the indictment that the defendants purchased these automobiles from the Nash Motor Company in Wisconsin, and had them shipped to their place of business in Oklahoma City. It is true that the purchase of cars in Wisconsin and the shipment and delivery thereof in Oklahoma City would constitute interstate commerce, but after these cars had been purchased in Wisconsin and shipped to Oklahoma City that consummated the interstate transaction and a new business began with the selling of said automobiles at retail to the general public in Oklahoma City. It is not charged in the indictment that the defendants sold any of the cars in its retail business outside of the state of Oklahoma or shipped them outside of the state of Oklahoma, and in the brief of the government it is admitted that, strictly speaking, the business of the defendants is a retail, intrastate business.

The argument of the government that, when a price is raised or lowered in a strictly intrastate transaction, the whole current of interstate commerce in that particular line of business is affected, is preposterous on its face. It is in direct conflict with the holding of the Supreme Court in every case involving that question, for in not a single case has the Supreme Court ever held that a strictly intrastate transaction, separate and apart from an expressed *intent* or *conspiracy* to interfere with the free flow of interstate commerce, affected or was a burden upon interstate commerce.

In a recent case decided by this court, U. S. v. Eason Oil Co., decided September 22, 1934, and reported in 8 F. Supp. 365 this court collected and analyzed many of the principal decisions of the Supreme Court of the United States on this particular question, and while the court does not deem it necessary to repeat that analysis and discussion, yet, since this case in all probability will go directly to the Supreme Court of the United States, the court again refers briefly to that line of decisions.

The first case to come before the Supreme Court in which that learned court even attempted to interpret the commerce clause of the Constitution was Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, in which Chief Justice Marshall defined "commerce" as "traffic and intercourse," and further said that the clause did not comprehend that commerce which is completely internal and carried on between man and man in a state, or between different parts of the same state and which does not extend to or affect other states.

In Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 477, 29 L. Ed. 715, the court said: "There must be a point of time when they cease to be governed exclusively by the domestic law, and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination. * * * Until then it is reasonable to regard them as not only within the state of their origin, but as a part of the general mass of property of that state, subject to its jurisdiction. * * * "

In Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 10, 32 L. Ed. 346, the court held that manufacturing is not interstate commerce, and said: "If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the states, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock-raising, domestic fisheries, mining,—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? * * * The power being vested in congress and denied to the states, it would follow as an inevitable result that the duty would devolve on congress to regulate all of these delicate, multiform, and vital interests, —interests which in their nature are, and must be, local in all the details of their successful management. * * * Any movement towards the establishment of rules of production in this vast country, with its many different climates and opportunities, could only be at the sacrifice of the peculiar advantages of a large part of the localities in it, if not of every one of them. * * * "

In Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 904, 59 L. Ed. 1397, the court said: "The mere fact that the coal might be or was intended to be used in the conduct of interstate commerce after the same was mined and transported did not make the injury one received by the plaintiff while he was engaged in interstate commerce. The injury happening when plaintiff was preparing to mine the coal was not an injury happening in interstate com-

merce, and the defendant was not then carrying on interstate commerce. * * * "

In Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 531, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, the court said:

"The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped, or used in interstate commerce, make their production a part thereof. * * *

" 'When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state.' Mr. Justice Jackson in Re Greene (C. C.) 52 F. 113. This principle has been recognized often in this court. Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. Ed. 615, and cases cited. If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the states, a result certainly not contemplated by the framers of the Constitution when they vested in Congress the authority to regulate commerce among the states. Kidd v. Pearson, 128 U. S. 1, 21, 9 S. Ct. 6, 32 L. Ed. 346."

In Crescent Cotton Oil Co. v. Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166, the court held that the ginning of cotton was not interstate commerce.

In Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 86, 67 L. Ed. 237, the court said:

"If the possibility, or, indeed certainty, of exportation of a product or article from a state determines it to be in interstate commerce before the commencement of its movement from the state, it would seem to follow that it is in such commerce from the instant of its growth or production, and in the case of coals, as they lie in the ground. The result would be curious. It would nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other states at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, and coal yet unmined because they are in varying percentages destined for and surely to be exported to states other than those of their production.

"However, we need not proceed further in speculation and argument. Ingenuity and imagination have been exercised heretofore upon a like contention. There is temptation to it in the relation of the states to the federal government, being yet superior to the states in instances or rather, having spheres of action exclusive of them."

In Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 529, 67 L. Ed. 929, the court said: "Mining is not interstate commerce, but, like manufacturing, is a local business, subject to local regulation and taxation."

In Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct. 548, 552, 76 L. Ed. 1038, the court said: "Without regard to the apparent continuity of the movement, appellant, in effect, is engaged in two activities; not in one only. So far as it produces electrical energy in Idaho, its business is purely intrastate, subject to state taxation and control. In transmitting the product across the state line into Utah, appellant is engaged in interstate commerce, and state legislation in respect thereof is subject to the paramount authority of the commerce clause of the Federal Constitution. * * * "

In Chassaniol v. City of Greenwood, 291 U. S. 584, 54 S. Ct. 541, 542, 78 L. Ed. 1004, the court, speaking through Mr. Justice Brandeis, said: "Ginning cotton, transporting it to Greenwood, and warehousing, buying, and compressing it there, are each, like the growing of it, steps in preparation for the sale and shipment in interstate or foreign commerce. But each step prior to the sale and shipment is a transaction local to Mississippi, a transaction in intrastate commerce."

In numerous other decisions the Supreme Court has held that a transaction strictly between citizens of the same state, not involving the clear intent to interfere with or burden interstate commerce, is not within the regulation of Congress under the commerce clause.

One of the early cases decided by the Supreme Court was Veazie et al. v. Moor, 14 How. (55 U. S.) 568, 573, 14 L. Ed. 545, and the court, in discussing the history and purpose of the commerce clause, said:

"The phrase can never be applied to transactions wholly internal, between citizens of the same community, or to a polity and laws whose ends and purposes and operations are restricted to the territory and soil and jurisdiction of such community. Nor can it be properly concluded, that, because the prod-

ucts of domestic enterprise in agriculture or manufactures, or in the arts, may ultimately become the subjects of foreign commerce, that the control of the means or the encouragements by which enterprise is fostered and protected, is legitimately within the import of the phrase foreign commerce, or fairly implied in any investiture of the power to regulate such commerce. A pretension as far reaching as this, would extend to contracts between citizen and citizen of the same State, would control the pursuits of the planter, the grazier, the manufacturer, the mechanic, the immense operations of the collieries and mines and furnaces of the country; for there is not one of these avocations, the results of which may not become the subjects of foreign commerce, and be borne either by turnpikes, canals, or railroads, from point to point within the several States, towards an ultimate destination, like the one above mentioned. Such a pretension would effectually prevent or paralyze every effort at internal improvement by the several States; for it cannot be supposed, that the States would exhaust their capital and their credit in the construction of turnpikes, canals, and railroads, the remuneration derivable from which, and all control over which, might be immediately wrested from them, because such public works would be facilities for a commerce which, whilst availing itself of those facilities, was unquestionably internal, although intermediately or ultimately it might become foreign.

"The rule here given with respect to the regulation of foreign commerce, equally excludes from the regulation of commerce between the States and the Indian tribes the control over turnpikes, canals, or railroads, or the clearing and deepening of watercourses exclusively within the States, or the management of the transportation upon and by means of such improvements. In truth, the power vested in Congress by article 1st, section 8th of the Constitution, was not designed to operate upon matters like those embraced in the statute of the State of Maine, and which are essentially local in their nature and extent. The design and object of that power, as evinced in the history of the Constitution, was to establish a perfect equality amongst the several States as to commercial rights, and to prevent unjust and invidious distinctions, which local jealousies or local and partial interests might be disposed to introduce and maintain. These were the views pressed upon the public attention by the advocates for the adoption of the Constitution, and in accordance therewith have been the expositions of this instrument propounded by this court, in decisions quoted by counsel on either side of this cause, though differently applied by them."

The same court, in U. S. v. Dewitt, 9 Wall. (76 U. S.) 41, 43, 19 L. Ed. 593, in discussing the commerce clause, said: "But this express grant of power to regulate commerce among the States has always been understood as limited by its terms; and as a virtual denial of any power to interfere with the internal trade and business of the separate States; except, indeed, as a necessary and proper means for carrying into execution some other power expressly granted or vested."

In the Trade-Mark Cases, 100 U. S. 82, 96, 25 L. Ed. 550, the court said: "When, therefore, Congress undertakes to enact a law, which can only be valid as a regulation of commerce, it is reasonable to expect to find on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several States, or with the Indian tribes. If not so limited, it is in excess of the power of Congress. If its main purpose be to establish a regulation applicable to all trade, to commerce at all points, especially if it be apparent that it is designed to govern the commerce wholly between citizens of the same State, it is obviously the exercise of a power not confided to Congress."

The learned counsel for the government in the conclusion of their argument stated that the one case which in their opinion was absolutely decisive of the issues in this case was State of Minn. v. Blasius, 290 U. S. 1, 54 S. Ct. 34, 36, 78 L. Ed. 131. The court sees no connection whatever between that case and the case at bar, but that case was largely decided on the same theory as Swift & Co. v. U. S., 196 U. S. 375, 25 S. Ct. 276, 280, 49 L. Ed. 518, Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 402, 66 L. Ed. 735, 23 A. L. R. 229, and Board of Trade of City of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839, which cases are now cited before discussion of the Blasius Case.

In Swift & Co. v. U. S., supra, the court said: "When cattle are sent for sale from a place in one state, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the purchase of the cattle is a part and incident of such commerce."

In Stafford v. Wallace, supra, which involved certain transactions by commission merchants in the stockyards at Chicago, and in which the actions and conduct of these commission men were sought to be brought within the regulations of an act of Congress (7 USCA § 181 et seq.), the court, in defining the specific acts of the commission merchants subject to federal regulation, said: "The stockyards are not a place of rest or final destination. Thousands of head of live stock arrive daily by carload and trainload lots, and must be promptly sold and disposed of and moved out, to give place to the constantly flowing traffic that presses behind. The stockyards are but a throat through which the current flows, and the transactions which occur therein are only incident to this current from the West to the East, and from one state to another. Such transactions cannot be separated from the movement to which they contribute and necessarily take on its character. The commission men are essential in making the sales, without which the flow of the current would be obstructed, and this, whether they are made to packers or dealers. The dealers are essential to the sales to the stock farmers and feeders. The sales are not in this aspect merely local transactions. They create a local change of title, it is true, but they do not stop the flow; they merely change the private interests in the subject of the current, not interfering with, but, on the contrary, being indispensable to, its continuity. The origin of the live stock is in the West; its ultimate destination, known to, and intended by, all engaged in the business, is in the Middle West and East, either as meat products or stock for feeding and fattening. This is the definite and well-understood course of business. The stockyards and the sales are necessary factors in the middle of this current of commerce."

This case was followed by that of Board of Trade of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 478, 67 L. Ed. 839, and in this case the court had to deal with a very similar proposition to that involved in the Stockyards Case, and said:

"If a corner and the enhancement of prices produced by buying futures directly burden interstate commerce in the article whose price is enhanced, it would seem to follow that manipulations of futures which unduly depress prices of grain in interstate commerce and directly influence consignment in that commerce are equally direct. The question of price dominates trade between the states. Sales of an article which affect the country-wide price of the article directly affect the

country-wide commerce in it. By reason and authority, therefore, in determining the validity of this act, we are prevented from questioning the conclusion of Congress that manipulation of the market for futures on the Chicago Board of Trade may, and from time to time does, directly burden and obstruct commerce between the states in grain, and that it recurs and is a constantly possible danger. For this reason, Congress has the power to provide the appropriate means adopted in this act by which this abuse may be restrained and avoided. * * *

"The Board of Trade conducts a business which is affected with a public interest, and is, therefore, subject to reasonable regulation in the public interest. The Supreme Court of Illinois has so decided in respect to its publication of market quotations. New York & Chicago Grain Exchange v. Chicago Board of Trade, 127 Ill. 153, 19 N. E. 855, 2 L. R. A. 411, 11 Am. St. Rep. 107. In view of the actual interstate dealings in cash sales of grain on the exchange, and the effect of the conduct of the sales of futures upon interstate commerce, we find no difficulty under Munn v. Illinois, 94 U. S. 113, 133, 24 L. Ed. 77, and Stafford v. Wallace, supra, in concluding that the Chicago Board of Trade is engaged in a business affected with a public national interest and is subject to national regulation as such."

In State of Minn. v. Blasius, supra, the court merely followed the rule laid down in the cases above quoted. Blasius was a commission merchant dealing on his own responsibility in the stockyards at South St. Paul. In the general movement of cattle and other live stock passing through the stockyards at South St. Paul, which constituted the live stock market for that particular section of the United States, many live stock were purchased by the commission merchants, for sale, to be transported into other states, and some to be delivered to purchasers within the state of Minnesota, and some to be kept in the pens in South St. Paul, fed for a time, and then resold, either to be shipped to points within or without the state. The state of Minnesota sought to tax these cattle while they were in the stockyards in South St. Paul. Blasius contended that he was engaged in interstate commerce, and therefore his stock were not subject to local taxation. The court held that the purchase and sale of these cattle constituted a part of the channel or flow of interstate commerce in this particular live stock industry of which the South St. Paul stockyards constituted the "throat"; that so long as the cattle were "at rest" in the South

St. Paul stockyards on the tax date, they were subject to the state tax, but it was nowhere held in that case that the actual sale or purchase of these particular cattle belonging to Blasius was not a part of the great current of interstate commerce in live stock. The court said: "The dealings at the South St. Paul Stockyards including the transactions of Blasius, as described in these findings, manifestly were so related to a current of commerce among the states as to be subject to the power of regulation vested in the Congress." And, after citing Swift & Co. v. U. S., and Stafford v. Wallace, the court said further:

"But because there is a flow of interstate commerce which is subject to the regulating power of the Congress, it does not necessarily follow that, in the absence of a conflict with the exercise of that power, a state may not lay a nondiscriminatory tax upon property which, although connected with that flow as a general course of business, has come to rest and has acquired a situs within the state. \* \* \*

"If the interstate movement has not begun, the mere fact that such a movement is contemplated does not withdraw the property from the state's power to tax it. Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715. \* \* \*"

The Blasius Case merely follows the rule heretofore announced by the Supreme Court that while property is at rest for an indefinite time awaiting transportation, or awaiting a sale at its place of destination, or at an intermediate point, it is subject to taxation. But if it be actually in transit to another state it becomes the subject of interstate commerce and is exempt from local assessment. In both instances the property, subject to tax or not subject to tax, as the case may be, is considered to be in interstate commerce. Bacon v. Ill., 227 U. S. 504, 33 S. Ct. 299, 57 L. Ed. 615; Susquehanna Coal Co. v. South Amboy, 228 U. S. 665, 33 S. Ct. 712, 57 L. Ed. 1015; Pittsburgh, etc., Coal Co. v. Bates, 156 U. S. 584, 15 S. Ct. 415, 39 L. Ed. 538; Brown v. Houston, 114 U. S. 622, 5 S. Ct. 1091, 29 L. Ed. 257; Diamond Match Co. v. Ontonagon, 188 U. S. 96, 23 S. Ct. 266, 47 L. Ed. 349.

■ The only question which this court pretends to determine in this case is whether or not the sale of automobiles, in a strictly retail business in the vicinity of Oklahoma City, constitutes interstate commerce, and this court, without hesitation, finds that there is no interstate commerce connected with the transactions described in this indictment, and if there is no interstate commerce, Congress has no authority to regulate these transactions. But as indicated before in this opinion, it is not the purpose of this court to pass upon the constitutionality of the act, but rather to call attention to the fact that the act itself did not contemplate the regulation of such transactions as are described in this indictment.

The act itself in the declaration of its policy says: "It is hereby declared to be the policy of Congress to remove obstructions to the free flow of *interstate* and *foreign* commerce which tend to diminish the amount thereof. \* \* \*" (15 USCA § 701.)

The purpose of the act was to regulate industry in so far as it affected interstate commerce, but it can hardly be contended, with any degree of reason, that the sale or purchase of a secondhand automobile in Oklahoma City between two persons, both of whom live in the same locality and within the same state, constitutes interstate commerce or affects or burdens interstate commerce.

If it be true of a secondhand automobile it would be true of a worn-out suit of clothes, a pair of shoes, or a discarded shirt, yet if a private citizen cannot dispose of such articles in which he actually has a property right without complying with some provision or regulation of a code assumed to have been made by virtue of an act of Congress, then Congress seeks to regulate and control those matters the regulation of which under the Constitution was not only denied to Congress but was delegated to the states. It is not the belief of this court that Congress had in contemplation any such minute or detailed supervision over the purely private transactions of individuals, wholly within the state.

It is, therefore, the judgment of this court that the code, sought to be enforced as defined and described in this indictment, is an exercise of power not possessed by Congress nor contemplated by Congress in the National Industrial Recovery Act, and is therefore unconstitutional and void.

The demurrers to the indictment are, therefore, sustained. An exception is allowed the government.