## UNITED STATES v. RIGGEN.
### No. 4554.

District Court, S. D. Iowa,
Central Division.
Jan. 29, 1935.

E. G. Moon, U. S. Dist. Atty., of Des Moines, Iowa, and Dwight L. Savage, counsel for National Recovery Administration, of Washington, D. C., for complainant.

Maxwell A. O'Brien (of Parrish, Cohen, Guthrie & Watters), of Des Moines, Iowa, for defendant.

DEWEY, District Judge.

The above-entitled suit came on for hearing in open court at Des Moines, Iowa, on its merits on the 19th and 20th days of December 1934. Evidence was introduced and the cause submitted. Upon request, plaintiff was given 30 days to file a brief and argument.

The purpose of the suit is to restrain the defendant from violating provisions of the code of fair competition set up by the code authorities for the bituminous coal industry of Iowa. Certain facts were stipulated as true and correct and introduced in evidence as follows:

"1st. The said defendant is a resident of the Southern District of Iowa, Central Division, said residence being in the Town of Harvey, Marion County, Iowa. He is the sole owner and operator of what is known as Mine No. 2, located approximately two miles southwest of the said Town of Harvey, which is the only mine belonging to the defendant involved in this controversy. Both in the operation of said mine, the removal of coal therefrom, and its sale this defendant acts solely as an individual; no partnership, association, organization, corporate or otherwise, having any part in the operation of the defendant's said mine or the sale of coal therefrom. He has invested approximately $25,000.00 in machinery and equipment used in the operation of said strip mine which is all of such a character that it rapidly deteriorates in value. This mine is known as a 'strip mine,' the coal being shoveled from the surface of the ground after the dirt has been removed from the surface of the coal by means of drag lines. The coal is then loaded into trucks and wagons and is delivered to its destination.

"2nd. The defendant has operated this mine since July 1933, and in that year produced or obtained therefrom about 7200 tons. During all of the time that he has operated this mine defendant has observed with his employees, there employed, the union scale of hours and wages.

"3rd. The defendant has made no shipments of coal by rail or otherwise to points outside the state of Iowa and at no time has ever intended to interfere with or restrain the movements of coal from other states into Iowa or from Iowa into other states or the sale thereof. Not over 20% of the coal sold by the defendant is shipped by rail and then only to points within the state of Iowa as designated by the purchaser of said coal. Neither has the defendant imported any coal from without the state of Iowa nor has he purchased any coal whatsoever and all sales made by him of coal were made exclusively to consumers and dealers located within the State of Iowa of coal produced at his said mine within the State of Iowa.

"4th. Pursuant to the Code of Fair Competition for the Bituminous Coal Industry referred to in the affidavit of Wayne P. Ellis, attached hereto, and to the National Industrial Recovery Act, the Iowa Sub-Divisional Coal Code Authority has been organized. The members of said Sub-Divisional Coal Code Authority were selected by the Iowa Coal Trade Association, which is an association consisting of coal producers and their representatives in the State of Iowa. Three members of said Sub-Divisional Code Authority were chosen from each of the four districts into which the State of Iowa has been divided by the Trade Association, and three members chosen at large. One non-voting member was appointed by the National Recovery Administration. The said Sub-Divisional Code Authority pursuant to the said Code and the National Recovery Act has adopted a schedule designated as Classifications and Minimum Delivered Prices, which was approved by the said member on the Code Authority appointed by the National Recovery Administration, and became duly effective for the months of November and December, 1933, and January, February, March, April, May, June, July, August, September, October, November, and December, 1934, and has also adopted supplements to the said schedules. These schedules are issued monthly. The prices set out in the said Schedule of Classifications and Minimum Delivered Prices and the supplements amending the same were adopted by the said Sub-Divisional Code Authority as of the dates named therein, and the said Sub-Divisional Code Authority has notified the said defendant of the prices thus fixed and established and also as changed and altered from time to time and has demanded that he comply therewith.

"5th. The Bituminous Coal Industry recognizes among others two classes of mines, viz. deep vein mines and strip mines; the defendant's mine which is involved in this controversy is a strip mine.

"6th. The defendant did not sign or voluntarily become a party to the said Code. The defendant is not a member of the Iowa Coal Trade Association, although the defendant is eligible for membership in the said association, and may have become a member by the payment of one dollar annual dues and one mill per ton per annum produced from his mines. Neither is the defendant a member of the said Sub-Divisional Code Authority. The defendant has at all times protested against the application of the minimum prices established un-der the schedule of Classifications and Minimum Delivered Prices to his sale of coal which he produces and sells as aforesaid.

"7th. The defendant's mine is located in District No. 3, as divided by the Iowa Coal Trade Association as aforesaid, and of the three members chosen from the District one is the operating official of the Banner Coal Co., the owner and operator of a strip mine located in that District. There has been no specific finding by the President of the United States after hearing that the price at which the defendant sells his coal is destructive of the coal industry, nor had any action been taken against the defendant under the provisions of Section 4 (b) of the National Industrial Recovery Act [15 US CA § 704 (b)] prior to the expiration of said Section 4 (b). The said Iowa Sub-Divisional Coal Code Authority has not, in the published Schedules of Classifications and Minimum Delivered Prices or otherwise, established separate prices or schedules of prices for coal produced from strip mines as distinguished from coal produced from deep vein mines.

"8th. The defendant has been indicted for a violation of the National Recovery Act on account of having sold coal in the month of December 1933, below the said schedule of Classifications and Minimum Delivered prices. The said indictment was returned by the Grand Jury in this court on April 26, 1934, in the case of the United States v. Charles A. Riggen, Criminal No. 4414, and said case is still pending and untried.

"9th. The statutes of the State of Iowa provide as follows:

"Section 9906, Code of Iowa, 1931: 'Any corporation organized under the laws of this or any other state or country for transacting or conducting any kind of business in this state, or any partnership, association, or individual, creating, entering into, or becoming a member of, or a party to, any pool, trust, agreement, contract, combination, confederation, or understanding with any other corporation, partnership, association, or individual, to regulate or fix the price of any article of merchandise or commodity, or to fix or limit the amount or quantity of any article, commodity, or merchandise to be manufactured, mined, produced, or sold in this state, shall be guilty of a conspiracy.'

"Section 9908, Code of Iowa, 1931: 'Any corporation, company, firm, or association violating any of the provisions of the two preceding sections shall be fined not less than five hundred nor more than five thou-

sand dollars, and any president, manager, director, officer, agent, or receiver of any corporation, company, firm, or association, or any member of any corporation, company, firm, or association, or any individual, found guilty of a violation thereof, shall be fined not less than five hundred nor more than five thousand dollars, or be imprisoned in the county jail not to exceed one year, or both.'

"Section 9909, Code of Iowa, 1931: 'All contracts or agreements in violation of any provisions of the three preceding sections shall be void.'

"10th. The defendant at the times set out in the Bill of Complaint sold coal—either 'mine run' or 'steam' coal from his strip mine at a price of $1.40 per ton, the 'mine run' coal being the coal produced by said strip mine and sold as it came from the mines, being neither cleaned, forked, nor screened, and defendant is now selling such 'mine run' coal at the price of $2.00 per ton and is selling 'lump' coal, which is that part of the coal produced from his strip mine from which the steam coal has been removed but which does not pass over a screen at the price of $2.50 per ton, and defendant is selling his 'steam' coal, which is the fine coal remaining after the above described 'lump' coal has been removed from the 'mine run', at the price of 75¢ per ton, all of which prices are for coal delivered at defendant's mine. The 'mine run' coal sold by defendant is coal taken from said strip mine by hand shovel, or power shovel, or scoop and thus loaded in wagons or trucks to be transported to nearby railroad cars for shipment or is transported by such trucks to the ultimate destination.

"11th. The United States possesses within its borders approximately one-half of the bituminous coal resources of the world. Within the past one-half century the extensive development of these vast resources has brought into being an industry which represented an extremely large capital investment, employed at times in excess of 700,000 men, and supplied this country with a major portion of its fuel and energy. The amount of coal exported to other countries has also been substantial. Coal is mined in thirty-two states, but over ninety (90%) per cent of the total tonnage of bituminous coal is produced in states east of the Mississippi River, and of the total amount approximately seventy-five (75%) per cent is produced in four states. Coal on the other hand is consumed in every state.

"12th. Many of the basic industries in this country depend upon bituminous coal for their energy supply and upon the industry as an important market for their products. In 1916 bituminous coal supplied 72.3% of the total national energy consumed. Even after the heavy inroads made by competitive fuels in recent years bituminous coal in 1932 supplied 44.9% of the total energy. The total energy supply includes petroleum products so that this latter figure overstates the invasion by competitive fuels.

"13th. In 1929 the industry spent in excess of $100,000,000.00 for supplies. Large quantities of steel rails, machinery, lumber, explosives, and other supplies are needed in the operations. The following table shows the amount of coal purchased by Class 1 railroads for locomotive consumption. The value of the coal includes the cost of hauling from the mines to those of the railroads whose lines are not along coal producing fields.

| Net Tons Purchased by Railroads for own consumption | | Cost |
|---|---|---|
| 1923 | 157,899,918 | $634,028,691.00 |
| 1926 | 139,602,076 | 366,234,326.00 |
| 1929 | 124,151,763 | 292,131,298.00 |
| 1932 | 74,670,282 | 149,327,909.00 |

"The following table shows the percentage of the total production of coal consumed as locomotive fuel by Class 1 railroads:

| "1923 | 23.3% | 1930 | 21.% |
|---|---|---|---|
| "1926 | 21.4% | 1931 | 21.4% |
| "1929 | 21.3% | 1932 | 21.4% |

"14th. Coal freight is an important source of railroad revenue. Statements filed with the Interstate Commerce Commission show that the freight revenue derived by railroads from hauling bituminous coal in 1930 was over 17% of the total freight revenue from all sources by common carriers. The total freight tonnage for 1930 which was 1,153,196,636 tons, the freight revenue from which was $4,206,986,000. Thus, in 1932, seven railroads operating in Iowa hauled commercial tonnage amounting to 1,153,912 tons of coal produced within the state. (These figures were obtained from the Interstate Commerce Commission records.)

"15th. The declining production and consumption of coal in recent years has resulted in a proportionate decline in the revenue derived by railroads from hauling coal.

The following table compares average value of coal f. o. b. mines with freight revenue from bituminous coal per net ton received by railroads of the United States during the years shown.

| Year | Average Value per net ton Bituminous Coal f. o. b. mines | Freight revenues per net ton from bituminous coal |
|------|------|------|
| 1923 | $2.68 | $2.30 |
| 1927 | 1.99 | 2.30 |
| 1929 | 1.78 | 2.25 |
| 1930 | 1.70 | 2.23 |
| 1931 | 1.54 | 2.22 |
| 1932 | 1.27 | 2.26 |
| Decrease 1923 to 1932 | $1.41 | $0.04 |
| Decrease in Percentage | 52.6% | 1.7% |

"16th. The production of bituminous coal has declined more or less steadily from 573,366,985 tons in 1926 to 309,709,872 tons in 1932. Consumption of coal in the United States for corresponding periods shows a similar trend. The average realization per ton of coal declined from its peak value of $3.75 in 1920 and the value of $2.68 in 1923 to $1.31 per ton in 1932.

"17th. The progressive decline in the industry can be gathered from the following figures compiled by the United States Bureau of Mines:

"Mine Realization (Average value of coal per ton at the mine for the entire United States).

| "1923 | $2.68 | 1929 | 1.78 |
| "1926 | 2.06 | 1930 | 1.70 |
| "1927 | 1.99 | 1931 | 1.54 |
| "1928 | 1.86 | 1932 | 1.31 |

"Mine Realization for Iowa

| "1923 | $3.59 | 1929 | 2.82 |
| "1926 | 3.07 | 1930 | 2.67 |
| "1927 | 3.15 | 1931 | 2.53 |
| "1928 | 2.86 | 1932 | 2.40 |

"Production (Net Tons) for Entire United States

| "1923 | 563,423,000 | 1929 | 534,988,593 |
| "1926 | 573,366,925 | 1930 | 467,526,299 |
| "1927 | 517,763,352 | 1931 | 382,089,396 |
| "1928 | 500,745,000 | 1932 | 309,709,872 |

"Production (Net Tons) for Iowa

| "1923 | 5,701,985 | 1930 | 3,892,571 |
| "1926 | 4,625,487 | 1931 | 3,388,355 |
| "1927 | 2,949,622 | 1932 | 3,862,435 |
| "1928 | 3,683,635 | 1933 | 3,351,130 |
| "1929 | 4,241,069 | | |

"Total Value of Production (at the Mines) for Entire United States

| "1923 | $1,514,621,000 |
| "1926 | 1,183,412,000 |
| "1927 | 1,029,657,000 |
| "1928 | 933,774,000 |
| "1929 | 952,781,000 |
| "1930 | 795,483,000 |
| "1931 | 588,895,000 |
| "1932 | 406,677,000 |

"Total Number of Men Employed in Bituminous Coal Mines:

| "1923 | 11,448 | 1929 | 7,295 |
| "1926 | 8,869 | 1930 | 7,901 |
| "1927 | 8,741 | 1931 | 7,897 |
| "1928 | 6,965 | 1932 | 8,086 |

"Total Average Days Worked in Mines for Entire United States

| "1923 | 179 | 1929 | 219 |
| "1926 | 215 | 1930 | 187 |
| "1927 | 191 | 1931 | 160 |
| "1928 | 203 | 1932 | 146 |

"18th. Aggravating other factors which caused the progressive decline in the production and value of bituminous coal in the United States has been the steady increase in the use of competing fuels, such as natural gas, oil, etc. While as heretofore pointed out, bituminous coal in 1919 supplied 72.3% of the energy consumed in this country, the proportion declined rapidly as follows: 63.5% in 1923; 57% in 1929; 55.7% in 1930; and 44.9% in 1932.

"19th. The number of men employed in the bituminous coal industry has decreased from 704,793, in 1923 to 406,380 in 1932. The total average number of days worked in bituminous coal mines was 215 in 1926, 203 in 1928, 219 in 1929, and 146 in 1932.

"20th. Wage bill data for the industry are available only for the census years 1919 and 1929. The comparison of the figures for those two years shows that even in the pre-depression year of 1929 the total wages for the industry has decreased from 1919 figure of $685,437,034.00 to $576,689,699.00. The total wage earnings for 1932 can be approximated by comparing the following figures:

"Production: 1929—534,988,593 tons. 1932—309,709,872 tons.

"Average value Per Ton in the Mines: 1929—$1.76. 1932—$1.31.

"Signed this 18th day of December, 1934. * * *"

The following facts are found by the court from evidence other than the facts stipulated.

1. The defendant has at all times since the bituminous coal code became effective sold coal at prices below that fixed by the code.

2. That the defendant has told the code authorities that he could not and would not comply with the prices established by the code.

3. That the members of the Iowa Coal Trade Association represent individuals and companies mining 75 per cent. of the coal tonnage of the state of Iowa, and of this tonnage 60 per cent. is produced by the large coal operators of Iowa.

4. That in addition to the defendant there are about 19 other coal operators who have been refusing to comply with the price regulations of the code.

5. The strip mine of the defendant produces more coal than any of the mines owned by operators refusing to comply with the code provisions as to price.

6. That operators of strip coal mines in Iowa selling at the code prices cannot successfully compete with strip mines whose operators are selling at prices reduced below those provided by the code.

7. That at least one strip mine operator who had been a member of the Iowa Coal Trade Association withdrew therefrom and sold coal at prices less than provided by the code, as his business was being lost to those selling below the code prices.

8. That partly on account of changed economic conditions causing users to burn cheap coal; partly on account of the use of auto trucks hauling direct from the mines to homes of consumers; partly on account of the increase of oil and gas for heating; and partly on account of the refusal of certain coal operators to abide by the price fixing of the coal code and to sell at the code prices, the amount of Illinois and Kentucky coal shipped into Iowa is reduced and seriously affects the business of deep vein coal companies selling at the code prices that are engaging in local Iowa coal business and in shipping out of the state and furnishing coal to railroads engaged in interstate commerce.

9. That the ultimate result of a substantial number of coal operators selling below the code price, if maintained by them, will result in the ruin of those Iowa operators continuing to sell at the code prices.

Under these facts the complaint asks that the defendant be enjoined by this court from violating the bituminous coal code for Iowa.

The defendant contends that he is law abiding and that under the situation disclosed he is not required to comply with the price fixing provisions of the code as he is not engaged in and his coal prices do not affect interstate commerce.

Other defenses are presented, among them, a charge that the Iowa Coal Trade Association is violating the provisions of the Code of Iowa which prohibits any corporate organization from regulating or fixing the price of any article or merchandise or commodity, and that any one joining such an association renders himself liable for a large fine or imprisonment.

The National Industrial Recovery Act, § 3 (c), 15 USCA § 703 (c) provides that the several district courts of the United States are invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under the chapter.

Section 3, title 1, of the National Industrial Recovery Act (section 703, title 15, U. S. C. [15 USCA § 703]), provides for and authorizes the President to approve a code of fair competition, as was done in this case. It also provides for the punishment of any violations of such code or any of the provisions thereof, "in any transaction in or affecting interstate or foreign commerce." Section 3 (f), 15 USCA § 703 (f).

And section 4 of title 1 of the Act (15 USCA § 704) provides, in substance, that, when the President shall find, after notice and hearing, that destructive price cutting is being practiced in any trade or industry, he may license any business enterprise to make effective a code of fair competition; and after such finding has been publicly announced, no person shall thereafter engage in or carry on any business in or affecting interstate or foreign commerce, unless he first obtains a license issued pursuant to regulations prescribed by the President. It is further provided that the President may suspend or revoke such license, after hearing, for violation of the terms or conditions thereof.

The evidence does not disclose that this administrative remedy was resorted to before this suit was instituted.

Aside from this administrative remedy, the restrictions as contained in section 3, title 1, supra, are as to violations of the code "in any transaction in or affecting interstate or foreign commerce."

The Government of the United States is one of limited jurisdiction. The Consti-

tution expressly so declares. Among the powers delegated to the United States by article 1 of the Constitution in section 8 thereof is the power "to regulate Commerce with foreign Nations, and among the several States."

The mining of coal is not commerce, nor does the fact that coal mined is to be afterwards shipped or used in interstate commerce make its production a part thereof. United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 410, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762. In other words, the government of the United States cannot regulate business, but only commerce. Commerce begins when the movement of a product is actually begun and ends when such product comes to rest at its destination. In construing the provisions of the power of Congress to regulate interstate commerce, it has been repeatedly held that Congress may regulate that which directly affects or burdens or obstructs interstate commerce, but it has never been held by the Supreme Court of the United States that Congress may regulate or control transactions in an intrastate business which only indirectly, remotely, secondarily, or merely probably affect interstate commerce. Cases cited, United States v. Neuendorf (D. C.) 8 F. Supp. 403.

Plaintiff recognizes that the defendant can be enjoined from selling coal below the price fixed by the code only if such violation of the code on his part is a transaction in or affecting interstate commerce. And the plaintiff also recognizes that any such violation must affect interstate commerce in the sense that it directly places a burden or obstruction thereon, or as plaintiff's attorney puts it in his brief, "burdens the free flow of interstate commerce." It is necessary then to determine from the evidence whether or not the refusal of the defendant to comply with the bituminous coal code for Iowa in the item of the prices charged by him for coal at his mine places a burden or obstruction on the free flow of interstate commerce. Plaintiff seriously and earnestly contends that it does. It contends, and the facts establish, that the operators of coal mines in Iowa in selling below the minimum coal prices reduce the coal tonnage or production of the mines of the operators who maintain code prices, and thus affects the business of the Iowa operators who ship coal out of the state or furnish coal to railroads doing an interstate business.

It also contends, and the facts establish, that the importation of coal into Iowa from Illinois and Kentucky fields has fallen off, occasioned to a large extent by the selling of cheap coal in Iowa with which foreign operators who maintain code prices cannot compete.

It also contends that if the defendant is stopped from selling coal below the code figures, the others so selling below the code figures will stop. This is speculation, although we may assume that if the penalties for violations of the provisions of the code could be enforced as against all business, operators of these smaller mines would comply or cease business.

The facts do not establish, however, that the acts of the defendant alone are responsible for this situation. Operators of mines aggregating about 25 per cent. of the coal tonnage produced in Iowa are not selling at the code prices. Defendant is not shown to be in any combination or conspiracy in restraint of trade or otherwise. He is complying with all labor and law requirements as to hours of work and wages of employees. The evidence does not establish that he is engaged in price cutting in the sense that he is selling below cost or below a price that brings a fair return for his investment and labor. And there is no evidence that he is responsible for the acts of any other operators in refusing to comply with the code prices, with one exception, as set out in the stipulated facts above given.

In its last analysis, the position of the government is that the price of commodities of any business affects all similar business in other states and the commerce of that product from one state to another, and thus lays a burden or obstruction on the free flow of commerce between the several states. Such contentions, where the businesses are entirely intrastate, enter the realm of conjecture and speculation and may explain the difficulties which plaintiff contends are encountered to produce proof of the causal connection between trade practices and interstate commerce.

Selling coal at a mine for a certain price is not engaging in interstate commerce, and if it affects the amount of coal shipped in or out of the state it does so indirectly. To regulate a business in its fixation of prices when that business is intrastate is a different thing than regulation of a business engaged in interstate commerce by removing burdens and obstructions, even to fixing

prices, that directly affect such interstate commerce.

We are admonished by counsel of the consequences to the trade when violators of the code are not restrained. The answer is the provisions of the act itself. It requires compliance only as to parties engaged in or whose acts or failure to act affect interstate commerce. This discrimination is due to the recognition by Congress of its limitation to regulate only such business as is so engaged. Congress has left to the states the decision whether intrastate business should be required to comply with the code provisions. The Iowa Legislature has not passed laws to that effect.

The Supreme Court has repeatedly held that Congress cannot, under the commerce clause of the Constitution, regulate business, unless it is engaged in or directly affects and burdens such commerce, and the district courts have also repeatedly held by long and detailed opinions, examination, and digests of the authorities, including those relied upon by the government, that a private business operating entirely within the state and not engaged in interstate commerce does not, by a violation of the codes of fair competition, affect directly and place a burden upon interstate commerce. United States v. Suburban Motor Service Corp. (D. C.) 5 F. Supp. 798; Hart Coal Corp. v. Sparks (D. C.) 7 F. Supp. 16; United States v. Mills (D. C.) 7 F. Supp. 547, 549; Irma Hat Co. v. Local Retail Code Authority (D. C.) 7 F. Supp. 687; United States v. Gearhart (D. C.) 7 F. Supp. 712; Edgewater Dairy Co. v. Wallace (D. C.) 7 F. Supp. 121; Royal Farms Dairy, Inc., v. Wallace (D. C.) 7 F. Supp. 560; Douglas v. Wallace (D. C.) 8 F. Supp. 379; United States v. Greenwood Dairy Farms (D. C.) 8 F. Supp. 398; United States v. Eason Oil Co. (D. C.) 8 F. Supp. 365; United States v. Kinnebrew Motor Co. (D. C.) 8 F. Supp. 535.

As a finding of ultimate fact and conclusion of law, I must conclude that, although the defendant is violating the provisions of the bituminous coal code, he is not violating any of the provisions of the National Industrial Recovery Act prohibiting acts or transactions of the defendant while engaged in or which affect interstate commerce. Plaintiff's petition should be dismissed upon its merits. The clerk is directed to enter the following order:

The above-entitled cause came on for hearing on the 19th and 20th days of December, 1934, at Des Moines, Iowa, on its merits to restrain the defendant from violating the code of fair competition for the bituminous coal industry in Iowa; evidence was taken, arguments had and briefs submitted, and the court being advised, it is ordered that plaintiff's complaint should be and the same is hereby dismissed on its merits. Plaintiff excepts.